[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————

No. 09-12869

———————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2010
JOHN LEY
CLERK

D. C. Docket No. 01-00772-CV-CLS-RRA

KENNETH GLENN THOMAS,

                                        Petitioner-Appellee,

                    versus

RICHARD F. ALLEN,

                                        Respondent-Appellant.

———————

Appeal from the United States District Court
for the Northern District of Alabama

———————

**(May 27, 2010)**

Before DUBINA, Chief Judge, BARKETT and WILSON, Circuit Judges.

DUBINA, Chief Judge:

Appellant, Richard Allen, Commissioner of the Alabama Department of Corrections, appeals the district court order granting Kenneth Glenn Thomas penalty phase habeas relief based on its finding that Thomas is mentally retarded and ineligible for execution pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002). Because we conclude that the district court did not clearly err in its mental retardation finding, we affirm.

## I. BACKGROUND

A Limestone County, Alabama, jury convicted Thomas for the intentional murder of Flossie McLemore during the course of a burglary. The jury unanimously recommended a death sentence, and the trial court followed the jury's recommendation and sentenced Thomas to death. The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed Thomas's conviction and death sentence. *Thomas v. State*, 539 So. 2d 375 (Ala. Crim. App. 1988); *Ex parte Thomas*, 539 So. 2d 399 (Ala. 1988). The United States Supreme Court denied certiorari review. *Thomas v. Alabama*, 491 U.S. 910, 109 S. Ct. 3201 (1989).

Thomas filed a state petition for post-conviction relief pursuant to Ala. R. Crim. P. 32, raising numerous claims for relief. With regard to Thomas's claim that he was mentally retarded and exempt from execution under the Eighth and

2

Fourteenth Amendments, the trial court determined that the claim was procedurally defaulted under state rules because Thomas could have raised the claim at trial or on direct appeal but failed to do so. Alternatively, the trial court found that the claim had been raised and fully litigated at trial and on direct appeal; therefore, it was precluded from granting Thomas post-conviction relief under Ala. R. Crim. P. 32.2(a)(2) and (a)(4). The state trial court also held that Thomas was not in fact mentally retarded and rejected his claim. [State R. 42 at 734–36.] With regard to Thomas's other claims, the trial court denied relief, and after conducting an evidentiary hearing on Thomas's claim that his trial counsel were ineffective for not investigating and developing evidence to support an insanity defense, denied Thomas post-conviction relief. The state appellate courts affirmed. *See Thomas v. State*, 766 So. 2d 860 (Ala. Crim. App. 1998) (holding that Thomas's Eighth Amendment claim was procedurally barred under state procedural rules and that as a matter of federal constitutional law, Thomas's Eighth Amendment claim was without merit); *Ex parte Thomas*, 766 So. 2d 975 (Ala. 2000).

In March 2001, Thomas filed a federal habeas petition pursuant to 28 U.S.C. § 2254 raising numerous challenges to his capital murder conviction and death sentence. The district court denied Thomas habeas relief with one exception—it

3

found that the state court's post-conviction determination that Thomas was not mentally retarded was contrary to, and an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Atkins,* as well as an unreasonable determination of the facts in light of the evidence presented in the state post-conviction court.  [R. 86 at 250–54 (citing 28 U.S.C. § 2254(d)).][1] Initially, the district court ordered that the case be remanded to state court for a re-evaluation of Thomas's mental retardation claim, but later, upon a joint motion of the parties, the district court withdrew that portion of its order and scheduled a hearing on Thomas's claim of mental retardation.  After an *Atkins* hearing, the district court found Thomas to be mentally retarded and ordered that the Limestone County, Alabama, Circuit Court re-sentence him to a term of life imprisonment without the possibility of parole.  The State appeals.

## II.  ISSUE

---

[1] Because the *Atkins* decision announced a "new rule of constitutional law made retroactive to cases on collateral review," *In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003), the district court noted that Thomas's Eighth Amendment claim that it would be cruel and unusual punishment to execute him because he is mentally retarded could not be defaulted under state procedural rules. Accordingly, the district court gave no deference to the state courts' opinions to the contrary and reviewed the claim under the parameters set forth in the Anti-terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 (2006).  In this appeal, the State does not challenge the district court's decision with respect to any procedural bar.  Thus, any such challenge is deemed abandoned, and we consider the merits of the issue according no deference to any state court decision on this, or any tangentially-related, issue. *See Holladay v. Allen*, 555 F.3d 1346, 1348 n.1 (11th Cir. 2009).

Whether the district court clearly erred in finding Thomas mentally retarded and ineligible for execution under the Eighth Amendment.

## III.  STANDARD OF REVIEW

"We review the district court's finding that [Thomas] is mentally retarded for clear error."  *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009) (citation omitted).  "Clear error is a highly deferential standard of review."  *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005).  "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (quoting *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

## IV.  DISCUSSION

A.  *Controlling Legal Criteria*

Unpersuaded that the execution of mentally retarded capital offenders would "measurably advance the deterrent or the retributive purpose of the death penalty," the *Atkins* Court held that the execution of mentally retarded capital offenders violates the Eighth Amendment.  536 U.S. at 321, 122 S. Ct. at 2252. The *Atkins* majority agreed that mentally retarded individuals should be punished

5

when they commit crimes, but also recognized that the disabilities of such persons in the areas of reason, judgment, and impulse control diminish their ability to "act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id.* at 306, 122 S. Ct. at 2244. The Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318, 122 S. Ct. at 2250. Because of these impairments, mentally retarded individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.,* 122 S. Ct. at 2250. Thus, the Court held that "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321, 122 S. Ct. at 2252.

Although the *Atkins* Court alluded to clinical definitions propounded by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"), it left to the states the development of standards for courts to employ in making a determination of whether an offender is mentally retarded. *Id.* at 317, 122 S. Ct. at 2250. Thus, we look to Alabama case law for guidance because the Alabama Legislature has not enacted any legislation

6

developing procedures by which a court may determine if a capital defendant is mentally retarded and thus ineligible for execution.

The Alabama Supreme Court in *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), held that a defendant alleging an Eighth Amendment mental retardation claim must show that he has significantly subaverage intellectual functioning (IQ of 70 or below), significant or substantial deficits in adaptive behavior, and that these problems manifested themselves during the developmental period (before the age of eighteen). Later, in *Smith v. State*, the Alabama Supreme Court added an additional element to the definition by stating that a defendant must exhibit significantly subaverage intellectual functioning abilities and significant deficits in adaptive behavior during three periods of his life: before the age of eighteen, on the date of the capital offense, and currently. ___ So. 2d ___, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007). "All three factors must be met in order for a person to be classified as mentally retarded for purposes of an *Atkins* claim." *Id.*

1. *Standardized Assessment Instruments*

The two most widely recognized and utilized intellectual functioning assessment instruments are the Wechsler Adult Intelligence Scales ("WAIS") and the Stanford-Binet Intelligence Scales ("SB"). The expert witnesses in this case

utilized these instruments, as well as others, to assess Thomas's intellectual functioning.[2]  When considering an individual's intellectual functioning test score, the evaluator may consider the Standard Error of Measurement ("SEM"), which is an index of the variability of test scores produced by persons forming the normative sample.  In other words, the SEM is a statistical measure that allows the evaluator to know the amount of error that could be present in any test.  The AAMR acknowledges that the SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning.  Hence, the IQ standard score is bounded by a range that would be approximately three to four points above and below the obtained scores.  [R. 130 at 20–31.]  In Thomas's case, the parties stipulated that a SEM of approximately plus or minus five points was proper for full-scale IQ test scores produced by the intelligence assessment instruments.  [*Id.* at 24.]

An evaluator may also consider the "Flynn effect," a method that recognizes the fact that IQ test scores have been increasing over time. [*Id.* at 31–39.] The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population

---

[2] We rely on the district court's very thorough explanation of these standardized assessment instruments and do not elaborate on them in this opinion. [R. 130 at 10–18.]

as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field. The parties in this case agree that the Flynn effect is an empirically proven statistical fact; however, they disagree on the extent to which an individual test subject's IQ score should be adjusted to take into consideration this phenomenon. [*Id.* at 33.]

a. *Developmental Period*

The record indicates that Thomas's first intellectual functioning evaluation occurred on October 4, 1968, when Thomas was nine years and seven months of age. Dr. David Loiry, Ph.D., a psychologist, administered a short form version of the Wechsler Intelligence Scales for Children ("WISC"). According to Dr. Loiry's report, Thomas's estimated full-scale IQ score of 56 placed him near the middle of the range of moderate mental deficiency according to the classification system utilized by the APA. [R. Pet'r Exh. 3 & 4.] Dr. Loiry recommended that Thomas be placed in a special class for the educable mentally retarded. [*Id.*]

When Thomas was thirteen, he took the California Test of Mental Maturity, Short Form, along with other students. That test measured various aspects of intellectual functioning, such as memory and logical reasoning, at five different levels of difficulty. Thomas's composite IQ score was 68. The third assessment

occurred in June 1973, when Thomas was fourteen years and two months of age. At the request of Dr. Frank M. Cauthen, M.D., Dr. Loiry administered four tests: the full WISC; the Wide Range Achievement Test; the Bender Visual Motor Gestalt Test; a figure drawing test; and a Rorschach test. Thomas's full-scale IQ score on the WISC was 64, and his other test results were poor. Dr. Loiry concluded that there was no doubt about Thomas's mental retardation. [*Id.*] Shortly after Thomas's sixteenth birthday, Jim Lenz, a psychometrist for the Limestone County School System, administered the WAIS to Thomas to determine whether he should remain in special education classes. Thomas's full-scale IQ score was 74, and Mr. Lenz concluded that Thomas was functioning in the educable range of mental retardation and should remain in special education classes. [R. Pet'r Exh. 6.]

   b. *Post-developmental Period*

   A month after Thomas's eighteenth birthday, Joyce Raley, a counselor at the West Limestone School, administered a WAIS test to Thomas, and he scored his highest full-scale IQ score—77. Prior to the murder trial, when Thomas was twenty-six years old, Dr. K. Hall, a doctor at the Taylor Hardin Secure Medical Facility, administered the revised WAIS to Thomas, who had a full-scale IQ of 71. Dr. Hall concluded that Thomas was functioning within the borderline range of

10

intellect. Dr. James Crowder, Ph.D., a psychologist, also administered a revised WAIS to Thomas prior to trial, and Thomas's full-scale IQ score was 65. In September 2007, in preparation for Thomas's federal evidentiary hearing on his *Atkins* claim, Dr. Harry McClaren administered a WAIS-III intelligence assessment to Thomas, and he obtained a full-scale IQ score of 65. Dr. McClaren also administered a test to Thomas to determine if Thomas was malingering, but the test results did not suggest malingering. Dr. Karen Salekin also administered an intelligence assessment to Thomas prior to the federal evidentiary hearing. She performed an SB5 intelligence assessment which indicated a full-scale IQ score of 62.

2. *Adaptive Behavior*

The AAMR defines the term "adaptive behavior" as the collection of conceptual, social, and practical skills that people learn in order to function in their everyday lives. [R. 130 at 42– 47.] *See also Holladay*, 555 F.3d at 1353. As we noted in *Holladay*, "significant or substantial deficits in adaptive behavior are defined as concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Id.* at 1353 (internal quotation

marks omitted).  Therefore, to satisfy this prong of the test for mental retardation, Thomas must show a deficiency in two of these listed areas.  *See id.*

Because Thomas had no standardized adaptive behavior assessments during his developmental period, the parties reviewed Thomas's public school records, his standardized test scores, his social worker's case records, and interviewed people who were acquainted with Thomas during this period, such as family members and teachers.[3]  The district court also reviewed these documents and relied extensively on the testimony presented during the evidentiary hearing to find that Thomas showed, by a preponderance of the evidence, that he had significant deficits in adaptive functioning prior to age eighteen in five areas: (1) functional academics; (2) work; (3) social and interpersonal skills; (4) home living; and (5) self-direction.  Additionally, there were no formal behavior assessments performed on Thomas on or about the date of the capital offense.  Relying on the tests, records, and testimony from the hearing, the district court

---

[3] Dr. Salekin stated that the APA did not require the use of standardized, adaptive-behavior assessment instruments prior to Thomas's eighteenth birthday.  She also testified that in 2002, it became a diagnostic requirement to test for adaptive functioning.  Dr. Salekin commented that, in her opinion, adaptive functioning "is more important than getting your IQ score."  [R. 124 Vol. I at 58.]

found that Thomas currently suffers substantial limitations in at least two adaptive behavioral skill areas: (1) social and interpersonal skills; and (2) self-direction.[4]

In preparation for the evidentiary hearing, Dr. Salekin summarized the dysfunctional and poor environment in which Thomas lived during most of his developmental period. Dr. Salekin referenced the Department of Pensions and Securities ("DPS") records that were replete with information indicating that social services had repeatedly deemed Thomas's parents unfit. When Thomas was living in the home with his parents, he was exposed to his father's alcoholism, his father's criminal activity, and his father's domestic violence toward his mother. The DPS records also contained information that on numerous occasions, Thomas's family did not have adequate food, clothing, and shelter, and Thomas's mother did not access appropriate medical services for the care and treatment of her children. In her report, Dr. Salekin noted that multiple informants stated that Thomas was heavily influenced by his father who taught him to steal and to engage in other illegal activities. [R. Dr. Salekin Report, Exh. 110 at 19-20.]

---

[4] The district court noted that the State did not dispute Thomas's assertion that he had proven that he presently has significant deficits in adaptive functioning. Accordingly, the district court determined that the State had abandoned any such challenge. However, in an abundance of caution, the district court considered the evidence of record in light of the legal and diagnostic standards and concluded that Thomas did presently show significant deficits in adaptive functioning in at least two areas: social/interpersonal skills and self-direction. [R. 130 at 122–25.] The State does not challenge this finding on appeal.

13

Even Dr. Marson recorded that Thomas's father took him to bars and taught him how to strip cars and rob houses. [R. Dr. Marson Report, Exh. 111-1 at 4–5.]

The DPS records also indicated that Thomas resided with his family from birth until the age of twelve, when the DPS removed him from the home and placed him in DPS protective custody as a result of his arrest for arson. The DPS placed him in three different foster homes. Thomas lived approximately one year at each of the first two foster homes. The third foster home, the farm of Mr. and Mrs. Wayne Ridgeway, was the most successful placement for Thomas. Thomas resided there with other special needs children of low cognitive ability. Thomas had daily chores on the farm, and he learned to drive a tractor. During this time, Thomas played baseball, did not use illegal drugs, did not get into trouble in school, and attended church. His placement with the Ridgeways ended when he turned eighteen. [R. Dr. Salekin Report, Exh. 110 at 20–21.]

Dr. Salekin also noted in her report that Thomas's older brother opined that Thomas could not have managed money or maintained a household. One of Thomas's foster parent's daughter informed Dr. Salekin that, based on her interaction with Thomas, he was not capable of taking care of all the things necessary to live independently. David Seibert, Thomas's special education teacher, stated that Thomas would have a difficult time functioning independently

14

in a community setting because it would be hard for Thomas to keep up with budgeting his money and paying his bills. [*Id.* at 25–26.] Dr. Marson reported that Thomas had limited skills in dealing with finances and money. Thomas did not know how to keep an accurate record of funds, he never learned how to use a money order, and he never had any bills to pay. During the interview, Thomas had significant difficulty calculating simple math computations. [R. Dr. Marson Report, Exh. 111-1 at 12.]

Three persons who had extensive contact with Thomas prior to age eighteen testified at the evidentiary hearing. Wayne Ridgeway, whose parents served as Thomas's foster parents for several years, testified that he saw Thomas every day while Thomas lived on the farm. He stated that Thomas did not have girlfriends and did not socialize and do things that other boys his age did. Wayne commented that he could not leave Thomas unsupervised while performing a task, and he had to give Thomas directions "over and over." [R. 124 Vol. I at 225–248.] He taught Thomas how to drive a tractor, but Thomas was the slowest of the 40 or more foster children he taught to drive a tractor. He opined that Thomas could not have lived independently.

David Seibert, Thomas's special education teacher in high school, stated that Thomas would not have been able to function well in a normal classroom, and

Thomas required much repetition in order to follow instructions. [R. 124 Vol. I at 263–288.] Carole Russell, Thomas's case worker from age twelve until eighteen, testified that Thomas was very immature, and his mannerisms were childlike. She thought he was very far behind both socially and educationally, and he had a poor ability to follow instructions. She also noted that Thomas not only lacked the maturity of children his same age, but he looked like a child much younger in age. [R. 124 Vol I at 289-125 Vol. II at 26.]

B. *Analysis*

The district court found that Thomas showed, by a preponderance of the evidence, that he suffers from significant limitations in intellectual functioning that originated before the age of eighteen years, were present on the date of the offense of conviction, and continue to the present day. The district court further found that Thomas showed, by a preponderance of the evidence, that his adaptive functioning abilities have been substantially impaired throughout his life, including the developmental period, the time surrounding the offense of conviction, and the present. As such, the district court found that Thomas is mentally retarded and is ineligible for execution because the imposition of the death penalty would violate the Eighth Amendment's prohibition against cruel and unusual punishment. On appeal, the State challenges the district court's findings

16

that Thomas showed limited intellectual functioning and limited adaptive functioning during the developmental period. The State proffers several specific challenges.

1. *Intellectual Assessment*

a. Failure to follow the IQ score of 70

The State contends that the district court committed clear error when it did not adhere to Alabama precedent holding that an IQ score of 70 is the cutoff for significantly subaverage intellectual functioning. *See, e.g.*, *Smith*, ___ So. 2d ___, 2007 WL 1519869, at *8; *Ex parte Perkins*, 851 So. 2d at 456. The State argues that had the district court properly followed Alabama precedent, it would have found that Thomas did not have subaverage intellectual functioning during the developmental period because he had an IQ score of 77 when he was eighteen years old. Additionally, in support of its assertion, the State references Thomas's increased scoring over the course of his developmental period.

Contrary to the State's contention, there is no Alabama precedent stating that when a capital offender has numerous IQ test scores during the developmental period, and one of those IQ scores is over 70, then the court cannot find the offender mentally retarded. The district court considered all of Thomas's IQ scores from the developmental period— 56 at age nine, 68 at age thirteen, 64 at

age fourteen, and 77 at age eighteen (shortly after the end of the developmental period), and concluded that Thomas had proven, by a preponderance of the evidence, that he suffered subaverage intellectual functioning during his developmental period. Because one or more of these raw scores, excluding the post-eighteen age score, clearly indicate mental retardation, and the mean of these three scores fell below the 70 score cutoff, the district court did not clearly err in its finding. There is no Alabama case law stating that a single, or even multiple, raw IQ score above 70 automatically defeats an *Atkins* claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning.

b. Failure to consider the IQ score of 77

The State argues that the district court's decision not to consider Thomas's highest IQ raw score of 77 is clearly erroneous. The State contends that this score was an accurate indication of Thomas's upward trend in intellectual functioning. The argument is not compelling. Even considering the IQ raw score of 77, taken after the termination of Thomas's developmental period, the mean of Thomas's IQ scores during the developmental period is sufficiently below 70. *See Holladay*, 555 F.3d at 1357–58 (district court found significant limitations in intellectual functioning based on multiple IQ scores, the mean of which was below 70). Thus,

18

the district court did not err because, even considering this high score, Thomas still showed, by a preponderance of the evidence, that he had significant subaverage intellectual functioning during the developmental period.

c. Application of Flynn effect

The State takes issue with the district court's employment of the Flynn effect. The question is not whether the district court's application of the Flynn effect to lower Thomas's IQ scores was mandatory, but whether the district court's application of it in this case was clearly erroneous. We cannot say that it was.

At the hearing, all the experts acknowledged that the Flynn effect is a statistically—proven phenomenon, although no medical association recognizes its validity. Numerous courts recognize the Flynn effect. *See e.g.*, *Walker v. True*, 399 F.3d 315, 322–23 (4th Cir. 2005) (stating that on remand, the district court should consider the Flynn effect evidence to determine if petitioner's IQ score is overstated); *United States v. Davis*, 611 F. Supp. 2d 472, 486–88 (D. Md. 2009) (district court considered Flynn effect in evaluation of defendant's intellectual functioning); *People v. Superior Court*, 28 Cal. Rptr. 3d 529, 558–59 (Cal. Ct. App. 2005), *overruled on other grounds by* 155 P.3d 259 (Cal. 2007) (recognizing that Flynn effect must be considered); *State v. Burke*, No. 04AP-1234, 2005 WL 3557641, at *13 (Ohio Ct. App. Dec. 30, 2005) (stating that court must consider

19

evidence on Flynn effect, but it is within court's discretion whether to include it as a factor in the IQ score). There are also courts that do not recognize the Flynn effect. *See In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (noting that circuit has not recognized Flynn effect as scientifically valid); *Berry v. Epps*, No. 1:04CV328-D-D, 2006 WL 2865064, at *35 (N.D. Miss. Oct. 5, 2006) (refusing to consider Flynn effect); *Bowling v. Commonwealth*, 163 S.W.3d 361, 374–75 (Ky. 2005) (noting that because Kentucky statute unambiguously sets IQ score of 70 as cutoff, courts cannot consider Flynn effect or SEM). Because there is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning, and there is no Alabama precedent specifically discounting a court's application of the Flynn effect, we cannot say that the district court clearly erred in applying it. The district court considered the Flynn effect just as it considered the other evidence in the record presented by the parties regarding Thomas's intellectual functioning. Moreover, even without application of the Flynn effect, Thomas has still shown by a preponderance of the evidence that he has significantly subaverage intellectual functioning. Hence, we are not left with a definite and firm conviction that the district court erred in its finding.

d. Application of SEM

The State also argues that the district court's utilization of the SEM was clearly erroneous because the court did not consider it as a plus or minus five point range indicating a confidence level in the IQ scores; instead, the district court used it as a five point downward adjustment in Thomas's IQ scores. Even if the district court improperly employed the SEM, it did not clearly err in its application. First, the parties stipulated at the hearing that the SEM was plus or minus five points. Second, Alabama courts have adopted the "most liberal definition of mental retardation employed by those states that bar the execution of the mentally retarded," *Burgess v. State*, 962 So. 2d 272, 299 (Ala. Crim. App. 2005), and Alabama courts have acknowledged the application of the SEM. *See Byrd v. State*, ___ So. 3d ___, No. CR-07-0113, 2009 WL 1164985, at *3 (Ala. Crim. App. May 1, 2009) (noting that the psychologist testified that there is a 95% confidence interval regarding the capital offender's IQ scores). Third, the district court adjusted Thomas's scores downward based on its finding that Thomas had significant deficits in adaptive behavior. Fourth, in this case, five of the eight raw IQ scores for Thomas were below 70, and the district court adjusted his scores downward based on the preponderance of the evidence that indicated that the higher IQ scores may have been overstated. Lastly, even if the district court improperly applied the SEM, Thomas's total mean raw IQ score was below 70, the

21

cutoff for intellectual functioning as stated by Alabama case law. In sum, the district court exercised its discretion to consider the SEM, as it did with the Flynn effect, and we cannot say that this was clear error.

2. *Adaptive Behavior*

The State takes issue with the district court's finding that Thomas showed, by a preponderance of the evidence, that he had significant deficits in adaptive functioning before his eighteenth birthday. The district court relied upon records maintained by public schools, DPS social worker records, the recollections of persons who were acquainted with Thomas during his youth, the testimony of experts at the evidentiary hearing, and the reports of experts to conclude that Thomas had pronounced deficits in five areas: functional academics, work, social/interpersonal skills, home living, and self-direction. The record supports the district court's findings, and the State cannot show that the district court clearly erred in its determination regarding Thomas's adaptive behavior during the developmental period.

David Siebert, Thomas's high school special education teacher, testified that Thomas was definitely mentally retarded, that he could not follow complicated directions, and that he required repetition before he retained information. Drs. Salekin and Marson testified that Thomas could not have survived in a regular

classroom.  Moreover, Thomas's IQ scores during his developmental period placed him in the mildly mentally retarded range.  Even the State's expert, Dr. McClaren, stated that all of Thomas's IQ scores prior to age eighteen are consistent with mental retardation.  [R. 125 Vol. II at 238.]  There is no clear error in the district court's finding that Thomas had a pronounced deficit in functional academics during his developmental period.

In challenging the district court's finding that Thomas had pronounced deficits in the work area, the State contends that Thomas worked at a farm performing manual labor and driving a tractor and that Thomas held several other menial jobs.  However, the experts testified that these skills are consistent with individuals with mild mental retardation.  Even the State's expert, Dr. McClaren, stated that mentally retarded persons can drive cars and hold menial jobs.  Thus, the district court's finding regarding Thomas's work deficit is not clearly erroneous.

The State claims that Thomas's ability to manipulate people shows that he did not have substantial limits in his social/interpersonal skills.  The State relies heavily upon the testimony of DPS social worker Carole Russell, who referenced an incident when Thomas, in the presence of his foster mother, told them he did not want to have contact with his biological mother, but when he was alone with

23

the case worker, told her that he did. The State also relies upon the testimony of Thomas's teacher who stated that Thomas seemed to get along well with his fellow classmates and the record evidence that Thomas played baseball and spoke of enlisting in the Navy.

The record indicates to the contrary. Wayne Ridgeway testified that Thomas did not have girlfriends and did not do things other boys his age did. Carole Russell also stated that Thomas was immature and socially behind his peers. Thus, contrary to the State's assertion, we are not left with the definite and firm conviction that the district court erred in finding that Thomas suffered substantial limitations in his social and interpersonal skills during his developmental period.

The State contends that the district court also clearly erred in finding that Thomas had limitations in his ability to live by himself and function independently. Again, the record is to the contrary. Dr. Marson testified that Thomas always needed an adult to assist him with his needs. Moreover, several witnesses testified that Thomas could neither live independently nor handle finances. The State's attempt to challenge the district court's finding regarding Thomas's limitations in self-direction also fails. The record indicates that Thomas was immature both socially and mentally, that he required lots of repetition in

24

order to follow instructions, and that he could not live independently. The State cannot show that the district court's finding that Thomas suffered substantial limitations in self-direction is clearly erroneous.

## V. CONCLUSION

The district court conducted a comprehensive examination of the record evidence and assessed the credibility of the experts and acquaintances who testified at the *Atkins* evidentiary hearing. The district court wrote a very lengthy, detailed opinion finding that Thomas had shown by a preponderance of the evidence that he is mentally retarded and ineligible for execution. Having conducted a thorough review of the record, we cannot say that the district court's finding is clearly erroneous. Accordingly, we affirm the district court's grant of sentencing phase habeas relief to Thomas.

**AFFIRMED**.