2010 OK CR 24

Michael Dewayne SMITH, Petitioner,

v.

STATE of Oklahoma, Respondent.

No. PCD–2010–150.

Court of Criminal Appeals of Oklahoma.

Nov. 5, 2010.

Steven M. Presson, Presson Law Office, Norman, OK, attorney for petitioner.

W.A. Drew Edmondson, Oklahoma Attorney General, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for respondent.

## OPINION DENYING SECOND APPLICATION FOR POST–CONVICTION RELIEF, MOTION FOR DISCOVERY, AND MOTION FOR EVIDENTIARY HEARING

A. JOHNSON, Vice–Presiding Judge.

¶1 This matter is before the Court on Petitioner Michael Dewayne Smith's second application for post-conviction relief, motion for discovery, and motion for evidentiary hearing. A jury convicted Smith in 2003 in the District Court of Oklahoma County, Case No. CF–2002–1329, of the first degree murders of Janet Moore and Sarath Pulluru. The jury assessed a sentence of death for each murder.[1] Since then Smith has challenged his Judgment and Sentence on direct appeal[2] and in collateral proceedings in this

---

1. Smith's jury found two aggravating circumstances to support the death penalty: (1) that the murders were heinous, atrocious, or cruel; and (2) the existence of a probability that Smith would commit criminal acts of violence that would constitute a continuing threat to society. Smith's jury also convicted him of first degree burglary, robbery with a firearm, and first degree arson. He was sentenced to twenty years impris-onment on the burglary count, thirty years on the robbery count, and thirty-five years on the arson count.

2. This Court affirmed Smith's Judgment and Sentence in *Smith v. State*, 2007 OK CR 16, 157 P.3d 1155. Certiorari was denied by the United States Supreme Court in *Smith v. Oklahoma*, 552

Court.[3] These challenges were unsuccessful.

¶ 2 In this application, Smith asserts the following claims:

1. His death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because he is mentally retarded, and trial, appellate, and post-conviction counsel were constitutionally ineffective for failing to raise this claim.

2. His convictions and sentences are unreliable, in violation of due process, because the State withheld exculpatory evidence.

3. Trial, appellate, and post-conviction counsel were constitutionally ineffective for failing to present evidence that Smith could not have knowingly and voluntarily waived his *Miranda*-warned rights because he was under the influence of phencyclidine (PCP) and because he suffers from organic brain damage and is mentally retarded.

4. Trial, appellate, and post-conviction counsel were constitutionally ineffective for failing to present a meaningful mitigation case by providing the jury with evidence that he suffers from drug-induced organic brain damage and low intelligence.

5. The trial court's answer to two jury questions outside the presence of counsel violated the Sixth and Fourteenth Amendments to the United States Constitution.

6. The cumulative effect of errors at the guilt and sentencing phases of trial violated the Eighth and Fourteenth Amendments to the United States Constitution.

## 1.

### Mental Retardation

¶ 3 Smith claims his death sentence violates the Eighth Amendment to the United States Constitution because he is mentally retarded. Smith bases his claim on the United States Supreme Court's decision in *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), which held that execution of mentally retarded criminals is prohibited by the Eighth Amendment as ex-

cessive punishment. *Atkins* did not set out an explicit definition for mental retardation, but left it to the states to develop ways to identify mentally retarded criminals and exempt them from the death penalty. *See id.* at 317, 122 S.Ct. at 2250 ("we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon execution of sentences") (quoting *Ford v. Wainwright,* 477 U.S. 399, 416–417, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986)). Four years after *Atkins,* the Oklahoma Legislature enacted 21 O.S. Supp.2006, § 701.10b. Section 701.10b governs the death penalty and mental retardation and states in relevant part:

C. The defendant has the burden of production and persuasion to demonstrate mental retardation by showing significantly subaverage general intellectual functioning, significant limitations in adaptive functioning, and that the onset of the mental retardation was manifested before the age of eighteen (18) years. An intelligence quotient of seventy (70) or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning; however, it is not sufficient without evidence of significant limitations in adaptive functioning and without evidence of manifestation before the age of eighteen (18) years. In determining the intelligence quotient, the standard measurement of error for the test administrated shall be taken into account.

*However, in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered mentally retarded and, thus, shall not be subject to any proceedings under this section.*

(Emphasis added).

¶ 4 Smith asserts that he meets the statutory criteria for being mentally retarded be-

---

U.S. 1191, 128 S.Ct. 1232, 170 L.Ed.2d 79 (2008).

3. Smith's original application for post-conviction relief was denied in an unpublished opinion. *See Smith v. State,* Case No. PCD–2005–142 (Feb. 24, 2009).

cause: (1) he has consistently scored within the range of mental retardation on standardized intelligence quotient tests; (2) he has significant limitations in adaptive functioning; and (3) the onset of mental retardation occurred before he was eighteen years old.

¶ 5 Smith did not raise this claim in the trial court, on direct appeal, or in his first application for post-conviction relief. Therefore, unless the claim could not have been presented previously in a timely application for post-conviction relief because the factual basis for the claim was not available or ascertainable through the exercise of reasonable diligence on or before that date, the claim is waived and we do not grant relief. 22 O.S. Supp.2006, § 1089(D)(8).

¶ 6 In support of his claim, Smith proffers three items of evidence:

(1) a report by psychologist Jerry White, PhD, dated January 24, 2001, which, among other things, includes a full-scale I.Q. score of 76 for Smith based on the Wechsler Adult Intelligence Scale—Revised (WAIS–R) instrument;

(2) a report by psychologist Faust Bianco, PhD, dated April 4, 2003, which, among other things, includes a full-scale I.Q. score of 79 for Smith based on the Wechsler Adult Intelligence Scale—III (WAIS–III) instrument; [4]

(3) a report by psychiatrist-neurologist-attorney Manuel Saint Martin, M.D., J.D., dated December 29, 2009. The report includes a full scale I.Q. score for Smith of 71 based on the Wechsler Adult Intelligence Scale–IV (WAIS–IV) instrument. Dr. Saint Martin's report also includes his opinions concerning Smith's limitations on adaptive functioning based on interviews with Smith's mother, stepfather, long-term cellmate, and other relatives.

¶ 7 It is clear from the face of this proffered evidence that Dr. White and Dr. Bianco's reports, and the I.Q. scores included in them, were available well before Smith's trial in August of 2003 and before his first application for post-conviction relief in May of 2006. Dr. Saint Martin's report, however, was not written at the time of Smith's first application for post-conviction relief, but was apparently written on December 29, 2009, 120 days before the filing of the instant application. Specific information about Smith's adaptive functioning contained in Dr. Saint Martin's report was derived from interviews with Smith's family members and cellmate. Similar information from some of these same family members was presented as mitigation evidence in the sentencing phase of Smith's trial and as part of his first application for post-conviction relief. Because the evidence proffered as the factual basis for this claim was available before Smith's first application for post-conviction relief, or was not presented to this Court within sixty days of its discovery, this claim is waived. 22 O.S. Supp.2006, §§ 1080–1089; Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App (2010); *see also Berget v. State*, 1995 OK CR 66, ¶ 2, 907 P.2d 1078, 1080.

¶ 8 Nevertheless, Smith attempts to excuse his failure to timely raise this issue by claiming that the failure was the result of ineffective assistance of trial, appellate, and post-conviction counsel. Smith argues that because he was represented on direct appeal by an attorney who represented him at trial, he could not have raised this issue until his first application for post-conviction relief when he was represented by different counsel. Assuming that Smith's failure to raise this issue on direct appeal is excused because he was represented by the same attorney at trial and on appeal, *see Davis v. State*, 2005 OK CR 21, ¶ 6, 123 P.3d 243, 245–46, the issue becomes whether post-conviction counsel was ineffective for not raising the mental retardation claim.[5]

---

**4.** The report notes that the evaluation was performed at the request of Smith's trial attorney, Wayne Woodyard of the Oklahoma Indigent Defense System.

**5.** We noted in our denial of Smith's first application for post-conviction relief that the record was not entirely clear that Smith was represented on direct appeal by the same attorney who represented him at trial. We nevertheless accepted post-conviction counsel's representations to that effect and do the same here. *See Smith v. State*, Case No. PCD–2005–142 (Feb. 24, 2009) (not for publication) at 3.

¶ 9 The heart of an ineffective assistance of counsel allegation is the underlying substantive claim that counsel supposedly mishandled. *Washington v. State*, 1999 OK CR 22, ¶ 57, 989 P.2d 960, 977. To determine whether an appellant has met his burden of proving counsel's performance was deficient and that he was prejudiced by that performance, we review the merits of the appellant's substantive claim. *Id.* Unless an appellant meets this burden, the substantive claim remains waived. *Id.*

¶ 10 To meet the threshold requirement of 21 O.S. Supp.2006, § 701.10b, that he must show an intelligence quotient of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, Smith proffers documents showing that he was given standard I.Q. tests in 2001, 2003, and 2009 with the following results:

| Test | Test Date | Smith's Age | Full Score IQ | Reference |
|------|-----------|-------------|---------------|-----------|
| WAIS–R | 01/24/2001 | 18 | 76 | Att. 22 |
| WAIS–III | 04/04/2003 | 20 | 79 | Att. 21 |
| WAIS–IV | 11/20/2009 | 27 | 71 | Att. 7 |

Smith argues that because section 701.10b sets the threshold for mental retardation at an I.Q. score of 70, and because it requires that "the standard measurement of error for the test administered shall be taken into account," all of his previous I.Q. scores fall into a range whose lower limits fall into the mentally retarded category when the standard error of measurement is considered for each score. Specifically, Smith argues that the error-adjusted ranges for each of these three tests are as follows:

| Test | Test Date | Full Score I.Q. | Adjusted Range at 95% Confidence Interval[6] |
|------|-----------|-----------------|----------------------------------------------|
| WAIS–R | 01/24/2001 | 76 | 64–74 |
| WAIS–III | 04/04/2003 | 79 | 69–79 |
| WAIS–IV | 11/20/2009 | 71 | 66–74 |

The problem with this argument is that while the language of section 701.10b directs that an I.Q. score near the cutoff of 70 be treated as a range bounded by the limits of error, it also directs unequivocally that no such treatment be afforded to scores of 76 or above. In particular, after stating that "[i]n determining the intelligence quotient, the standard measurement of error for the test administered shall be taken into account," section 701.10b goes on to say: "however, in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on *any* individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered mentally retarded and, thus, shall not be subject to any proceedings under this section" (emphasis added). By directing that no defendant be considered mentally retarded who has received an I.Q. score of 76 or above on *any* scientifically recognized standardized test, the Legislature has implicitly determined that any scores of 76 or above are in a range whose lower error-adjusted limit will always be above the threshold score of 70.

¶ 11 It is clear then, that with two I.Q. scores of 76 and 79, Smith's current claim fails under the express language of 21 O.S. Supp.2006, § 701.10b. Consequently, prior counsel's failure to raise the mental retardation issue was not deficient performance. Neither trial, appellate, nor post-conviction

---

6. These scores are taken from Dr. Saint Martin's report. The scores are adjusted not only for the standard error of measurement, but also include a downward adjustment for the so-called Flynn Effect. The Flynn Effect is a theory based on the premise that results on any given I.Q. test will rise approximately 3 points for every 10 years that the test is in existence. The Flynn Effect has not achieved universal acceptance in courts where it has been raised. *See Thomas v. Allen*, 607 F.3d 749, 757–58 (11th Cir.2010)(collecting cases). In this instance, however, unlike other jurisdictions that have considered the Flynn Effect, the Oklahoma Legislature has directed that only the standard error of measurement be included in the consideration of a defendant's I.Q. scores when making a mental retardation determination. *Compare, Thomas*, 607 F.3d at 752, 757–58 (considering Flynn Effect, but doing so after noting that Alabama Legislature had not yet enacted procedures by which courts may determine if capital defendant is mentally retarded and thus ineligible for execution). Thus, it seems that under the Oklahoma statutory scheme, the Flynn Effect, whatever its validity, is not a relevant consideration in the mental retardation determination for capital defendants.

counsel were ineffective. This issue is waived.

### 2.

### Exculpatory Evidence

■ ¶ 12 Smith claims his convictions and sentences are unreliable and violate his rights to due process and a fair trial. Smith contends that recently executed affidavits by trial witnesses Marcus Berry and Sheena Johnson demonstrate that: (1) the State withheld exculpatory evidence; (2) the trial judge was biased; and (3) the State failed to correct perjured testimony. In their affidavits, Berry and Johnson recant portions of their trial testimony and claim that they testified falsely because they were threatened and coerced by police and the trial judge. Smith contends that the evidence of coercion and threats against these two witnesses was in the possession of the police and prosecutors and that this information was exculpatory because it would have shown that Johnson and Berry's testimony was not credible.

¶ 13 Sheena Johnson's affidavit is dated December 9, 2009. In the affidavit, Johnson alleges that: (1) her children were taken away from her by the trial judge to force her to testify against Smith; and (2) she testified falsely about certain statements Smith made to her about the Pulluru murder and that she did so using information police told her to include in her testimony. Johnson's allegation about her children being taken from her as coercion was known at the time of Smith's 2003 trial. It was discussed between Smith's trial attorney, the judge, and the prosecutor, in response to the prosecutor's objection to Smith's cross-examination of Johnson, in which defense counsel inquired into Johnson's reasons for testifying.[7] Johnson's fear about losing her children was also known at the time of Smith's preliminary hearing in 2002, when she stated her belief that if she did not testify "I would have got arrested and my—I have a three-month-old baby and he would have—child welfare would have got him" (P.H. 54). Obviously, Johnson's fear of having her children taken away from her as

retribution for not testifying was information that was known at the time of Smith's trial and could have been used to raise this issue on direct appeal or in Smith's first application for post-conviction relief. This information cannot serve as the factual basis for a second application for post-conviction relief. 22 O.S. Supp.2006, § 1089(D)(8).

¶ 14 Additionally, the single piece of new information contained in Johnson's affidavit (i.e., that she lied about Smith's statements concerning the Pulluru murder under police direction) was certainly available at the time the affidavit was executed on December 9, 2009, if not earlier. Under our rules, a second application for post-conviction relief must be filed within sixty days from the date a previously unavailable factual basis for an application is discovered. Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App (2010). Based on the date of the affidavit, the factual basis for this claim was known for at least 132 days before the instant application was filed. Thus this aspect of Smith's claim is also procedurally barred.

¶ 15 Marcus Berry's affidavit is dated January 11, 2010. In the affidavit, Berry alleges that he testified falsely on a number of points at Smith's trial. Again, under our rules, a second application for post-conviction relief must be filed within sixty days from the date a previously unavailable factual basis for an application is discovered. Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App (2010). Based on the date of the affidavit, the factual basis for this claim was known for at least 99 days before the instant application was filed. This aspect of Smith's claim is procedurally barred.

### 3.

### Ineffective Assistance of Counsel and Miranda Waiver

¶ 16 Smith claims that trial counsel was constitutionally ineffective for failing to adequately investigate and present evidence that he could not have knowingly or voluntarily

---

7. *See* Tr. Vol. 8 at 84–86.

waived his *Miranda*-warned [8] rights because he: (1) was under the influence of phencyclidine (PCP); (2) suffers from low intelligence; and (3) is mentally retarded and has organic brain damage.

## A. *PCP Intoxication*

■ ¶ 17 Smith raised the PCP intoxication claim in the district court and on direct appeal. Here, however, he claims that trial counsel was ineffective for not presenting the testimony of properly credentialed experts who could have opined that Smith's conduct during the videotaped interview with detectives showed that he was under the intoxicating effects of PCP and was, therefore, unable to knowingly and voluntarily waive his *Miranda*-warned rights. Smith contends that his failure to raise this aspect of his claim on direct appeal should be excused because he was represented on direct appeal by a constitutionally ineffective attorney who assisted with his trial defense. He contends further that his failure to raise the issue in his first application for post-conviction relief should be excused because post-conviction counsel was similarly ineffective for not raising the issue.

¶ 18 Assuming that Smith's failure to raise this issue on direct appeal is excused because he was represented by the same attorney at trial and on appeal, *see Davis v. State,* 2005 OK CR 21, ¶ 6, 123 P.3d 243, 245–46, the question devolves to whether post-conviction counsel was ineffective for not challenging trial counsel's failure to present testimony from "properly credentialed" experts to the effect that Smith could not have voluntarily waived his *Miranda*-warned rights because his actions in the videotaped interview showed he was intoxicated by the drug PCP at the time of the waiver.

■ ¶ 19 To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052,

2064, 80 L.Ed.2d 674 (1984). To establish prejudice, "it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's *unprofessional* errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 20 At a pre-trial *Jackson v. Denno* hearing,[9] the district court heard the testimony of defense expert Dr. Thomas Kupiec, a forensic toxicologist. Dr. Kupiec conducted tests on Smith's pubic hair that revealed that Smith still had detectable quantities of PCP in his body after being incarcerated. Dr. Kupiec explained to the court that because the PCP was found in Smith's hair, it indicated that he was a long-term, frequent, or chronic PCP user. Dr. Kupiec believed that as a long-term user, Smith was suffering from PCP psychosis at the time he was interrogated. Furthermore, Dr. Kupiec testified that Smith's reported behavior at the county jail on the day he was arrested was consistent with someone under the influence of PCP and that Smith could have been under the influence of PCP when he was interrogated by detectives three days after his arrest. The district court judge refused to allow Dr. Kupiec to answer defense counsel's question about whether Smith's long-term use of PCP affected his ability to understand and exercise his *Miranda*-warned rights. Dr. Kupiec was allowed to testify, however, that because he was not a psychologist or psychiatrist, he would be unable to determine from watching the videotape of Smith's interrogation whether he was under the influence of PCP.

¶ 21 Smith contends that trial counsel were ineffective at this point for not presenting a properly credentialed expert to testify that his conduct during the videotaped interview showed that he was under the influence of

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), established a defendant's right to an *in camera* hearing on the voluntariness of a confession.

PCP and, therefore, that he was unable to understand the rights he was waiving. To support this contention, Smith cites to seven documents proffered as attachments to the appendix of exhibits accompanying his application. Five of the cited attachments (Atts. 14–18) are not included in the appendix, but are listed in the appendix's index as "[r]emoved" as "not relevant to the issues presented" (Appendix, unnumbered page 2). The two remaining cited attachments consist of a report by Dr. Deborah C. Mash, PhD, Professor of Neurology at the University of Miami School of Medicine, dated January 12, 2010, and a report by Dr. Manuel Saint Martin, M.D., J.D., Psychiatrist–Neurologist, January 6, 2010. These reports contain each doctor's assessment of the videotape of Smith's interview with detectives.

¶ 22 Dr. Saint Martin observes that in the video Smith appears agitated, has a rambling speech pattern, and that he responds to questions in an "animated manner that is inappropriate to the nature of the situation" (Att. 6 at 1). According to Dr. Saint Martin, "PCP could result in Mr. Smith's behavioral manifestations on the video recording" because "some PCP users have symptoms of intoxication for 24 to 48 hours," even though the typical clinical picture of PCP intoxication only lasts four to eight hours (Att. 6 at 2).

¶ 23 Dr. Mash also reviewed the videotape and described Smith's behavior and speech as "bizarre and often unintelligible, grandiose, delusional in part and [showing] evidence [of] fragmented thought patterns" (Att. 4 at unnumbered page 5). From these observations, Dr. Mash concludes "with certainty" that Smith appeared to have been in a state of PCP intoxication at the time he confessed to detectives (Att. 4, unnumbered page 5). Like Dr. Saint Martin, Dr. Mash also notes that PCP intoxication typically lasts four to eight hours after a recreational dose, "with some users reporting subjective effects for 24–48 hr" (Att. 4 at unnumbered page 4). According to Dr. Mash, the combined effects of PCP intoxication and Smith's low intellectual functioning and organic brain damage together impaired his higher order reasoning and judgment abilities such that "he could not adequately comprehend his *Miranda* rights or assess the ramifications of a waiver of those rights" (Att. 4 at unnumbered page 2).

¶ 24 We find that this proffered evidence is insufficient to show that trial counsel was ineffective. Specifically, we are convinced that expert testimony such as that contained in these two reports would not have changed the district court's decision on the voluntariness of Smith's waiver or our opinion on direct appeal affirming that decision. *See Strickland,* 466 U.S. at 693–94, 104 S.Ct. at 2067–68 (holding that to establish prejudice sufficient to warrant finding of ineffective assistance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

¶ 25 In finding that Smith voluntarily waived his *Miranda*-warned rights, the district court had already heard Dr. Kupiec's testimony explaining that Smith could have been experiencing lingering effects of PCP intoxication when he was interviewed three days after his arrest. Dr. Saint Martin and Dr. Mash's reports add nothing new in this regard. The only things that Dr. Saint Martin and Dr. Mash add are their observations of Smith's conduct during the interview and their opinions based on those observations that Smith was of such limited intellectual functioning and so intoxicated by PCP at the time he waived his *Miranda*-warned rights that he could not understand what he was doing.

¶ 26 While the trial court sitting as the trier of fact in this instance did not have Dr. Mash or Dr. Saint Martin's opinions before her, she did hear a proffer from defense counsel that a neuropsychologist, Dr. Faust Bianco, would testify as to Smith's low intelligence and how his slowness in processing information would have been exacerbated by PCP. The court was also told that Dr. Bianco would testify as to the differences between Smith's behavior on the videotape and his behavior when Dr. Bianco interviewed him one year later.

¶ 27 After hearing the proffer and ruling that Dr. Bianco's testimony about Smith's intelligence and differing behavior in the two

settings would be irrelevant, the district court judge explained in detail how her own observations of Smith during the two-hour videotaped interview showed a cocky and extremely verbal individual, who was able to mislead people, read a newspaper, persuade others to assist him in hiding and avoiding arrest, conceal his identity, obtain an apartment, and explain various gang activities. According to the judge, these observations convinced her that Smith demonstrated sufficient intelligence and sufficiently clear thinking for her to find that the State had met its burden of showing that Smith's waiver of rights was voluntary. On direct appeal, we concluded that the videotaped interview showed "a coherent Smith calmly conversing with detectives, giving rational answers to their questions, and apparently capable of understanding the *Miranda* warnings provided by the interrogating officers." *Smith v. State,* 2007 OK CR 16, ¶ 46, 157 P.3d 1155, 1171.

¶ 28 Based on the district court's careful review of Smith's behavior on the interview tape, and in light of the fact that the district court heard expert testimony that Smith may have been suffering from the lingering effects of PCP intoxication at the time of this interview and received proffered evidence of Smith's low intelligence, we do not find a reasonable likelihood that testimony from Dr. Mash or Dr. Saint Martin (or both) would have changed the outcome of the judge's conclusion that Smith voluntarily waived his *Miranda*-warned rights. Nor do their opinions change our conclusion as stated in Smith's direct appeal that the trial court's finding was proper.

¶ 29 Because there is not a reasonable likelihood that Dr. Mash and Dr. Saint Martin's testimony would have changed the outcome of the trial court's decision on the voluntariness of Smith's *Miranda* waiver, Smith fails to show prejudice flowing from the alleged errors committed by trial, appellate, and post-conviction counsel. This claim does not qualify for relief under *Strickland.*

**B.  *Low Intelligence***

¶ 30 Smith also claims that trial counsel were ineffective in their challenge to the voluntariness of his statements for not providing the trial court with expert evidence that he (Smith) suffered from organic brain damage and low intelligence (caused by his long term daily use of PCP). This claim is belied by the record.

¶ 31 While not couched in terms of organic brain damage, Smith's attorneys offered the expert testimony of forensic toxicologist Dr. Kupiec and proffered the testimony and report of Dr. Bianco, a clinical neuropsychologist, to the effect that Smith was suffering from PCP-induced low intelligence, and therefore could not have voluntarily waived his *Miranda*-warned rights. Specifically, after extensive discussion with the judge, defense counsel (on May 21, 2003) summarized the argument and proffer as follows:

Basically, we would show that he [Smith] has a core intellectual range of 79 that is borderline to low average intelligence that affects his processing speed. Dr. Bianco would state that he has decreased information processing speed, meaning his ability to understand, to formulate and make decisions based on information given to him verbally. I believe the doctor would testify, as I stated earlier, that he was reading at a third or fourth grade level or very low level and math was certainly third or fourth grade as I recall.

That he [Dr. Bianco] did look at the tape. That there was a substantial difference between his [Smith's] conduct on the tape of the interview in 2002, versus his doctor's own clinical observations a year later and that this difference could very well be due to the slowness of processing as well as the PCP effect that has been demonstrated by, we believe, other witnesses as well as the testimony of Dr. Kupiec.

That the test clearly indicated that Michael has a substantial abuse problem. That if allowed to give an opinion he would state that the functioning at a borderline or low average range with deficiencies in the information processing speed and the influence of the chronic and current PCP use would affect his ability to understand the *Miranda* warnings and more importantly to understand the consequences of waiving those warnings. He [Dr. Bianco] would

also state that if a person who is a chronic user, says that they think better under the drug that's contrary to the clinical studies and information.

Based on this record, there is no merit to Smith's claim that trial counsel were ineffective for not challenging the voluntariness of Smith's *Miranda* waiver on the grounds of low intelligence and chronic long-term drug abuse.

C. *Mental Retardation and Organic Brain Damage*

¶ 32 Smith also argues that trial, appellate, and post-conviction counsel were ineffective for not challenging the voluntariness of his *Miranda* waiver by claiming he was mentally retarded and suffering organic brain damage from long-term drug abuse. In support of this claim, Smith relies on those portions of Dr. Mash and Dr. Saint Martin's 2010 reports that opine that Smith is mentally retarded and that Smith's substance abuse could have caused brain damage that impaired his cognitive functioning to the extent that he could not adequately comprehend the *Miranda* warnings given him by police or assess the consequences of a waiver of the rights covered by those warnings.

¶ 33 Again, to prevail on a claim of ineffectiveness of counsel, a defendant must show prejudice from the alleged error of counsel, *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, and to establish prejudice, "[it] is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *id.* at 693, 104 S.Ct. at 2067. Rather, a defendant must show "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

¶ 34 In this instance, despite argument and proffers of evidence from counsel about Smith's low intelligence and mental impairment from drug abuse, the trial court judge concluded that Smith had sufficient intellectual functioning to waive his *Miranda*-warned rights. To support her conclusion, the judge gave a detailed account of her own observations of Smith's behavior on the two-hour police interview videotape and explained

how Smith's behavior on that tape convinced her that Smith possessed sufficient intelligence and cognitive functioning to voluntarily waive his *Miranda*-warned rights. Based on our review of the judge's rationale and the record of the *Jackson v. Denno* hearing, we are not persuaded that Dr. Mash and Dr. Saint Martin's opinions about Smith's mental retardation or cognitive functioning would have swayed the judge to a different result. Hence there was no prejudice and counsel were not ineffective.

**4.**

**Ineffective Assistance of Counsel in Mitigation Phase**

¶ 35 Smith claims that trial counsel were ineffective in presenting his mitigation case at sentencing for failing to provide his jury with expert evidence that he suffered from organic brain damage and low intelligence caused by long-term daily use of the drug phencyclidine (PCP). Specifically, Smith cites to Dr. Saint Martin's report in which he states that: (1) Smith suffers from a "brain insult" caused by substance abuse; and (2) long term use of PCP inhibits the brain's ability to learn new information; (Appl. at 35–36, citing Att. 7 at 12–13). Smith also refers to Dr. Mash's report in which she stated that: (1) tests on Smith indicated "non-specific brain damage affecting his attention, calculation, and short term memory [that] could be due to Mr. Smith's substance abuse"; and (2) Smith's chronic drug use contributed to "diffuse impairment of cognitive functioning" and "undoubtedly contributed to development of brain abnormalities" (Appl. at 36, citing Att. 4 at 3–5). Smith also cites to the April 4, 2003, report by Dr. Faust Bianco in which Dr. Bianco reported that Smith began smoking marijuana on a daily basis at age ten and started smoking PCP on a daily basis at age eleven.

¶ 36 Assuming without deciding that counsel were deficient for failing to present this type of mitigating evidence at the sentencing stage, Smith cannot demonstrate a reasonable probability that the evidence would have affected the jury's weighing of the aggravating and mitigating evidence. Specifically, as other courts have observed, evidence of this

sort has a "double-edged" quality. *Wackerly v. Workman,* 580 F.3d 1171, 1178 (10th Cir. 2009). That is, a jury presented with evidence that the defendant is a chronic substance abuser might draw a negative inference from that evidence just as easily as it might find it mitigating. *See Davis v. Executive Dir. of Dep't of Corr.,* 100 F.3d 750, 763 (10th Cir.1996) (finding petitioner not prejudiced by counsel's failure to investigate and present expert testimony at sentencing on nature and effects of his severe alcoholism because whatever the mitigating effect of such evidence, it was equally possible that jury would have faulted petitioner for repeated failures to address problem). In the current case in particular, such evidence might bolster a conclusion that the defendant represents a continuing threat to society, one of the aggravating circumstances charged in this case. *Cf. Wackerly,* 580 F.3d at 1178 (reviewing cases).

¶ 37 Given the uncertainty about how a jury might receive this type of evidence, we cannot find that Smith has demonstrated a reasonable probability that the jury would have reached a different sentencing result if it had been presented with evidence of Smith's chronic use of PCP and its allegedly attendant brain damage. Smith's counsel were not ineffective. *See DeLozier v. Sirmons,* 531 F.3d 1306, 1332 (10th Cir.2008) (finding that appellate counsel's decision not to argue that trial counsel was ineffective for failing to put on evidence of petitioner's substance abuse was not ineffective assistance because such evidence can be considered a "two-edged" sword), *cert. denied,* —— U.S. ——, 129 S.Ct. 2058, 173 L.Ed.2d 1138 (2009); *Pace v. McNeil,* 556 F.3d 1211, 1224 (11th Cir.2009) (finding that trial counsel's failure to present evidence of petitioner's substance abuse was not deficient in part because "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword'; while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence") *cert. denied,* —— U.S. ——, 130 S.Ct. 190, 175 L.Ed.2d 118 (2009); *Jones v. Page,* 76 F.3d 831, 846 (7th Cir.1996) (finding that counsel's failure to introduce evidence of petitioner's drug abuse was reasonable strate-

gic choice because such evidence was "double-edged sword").

### 5.

### Jury Notes

¶ 38 Smith claims his Sixth and Fourteenth Amendment rights were violated when the trial court judge replied to two jury notes without counsel being present. Smith acknowledges that this claim was raised and decided in his direct appeal. He requests, however, that we reconsider our disposition of this claim in the interest of justice. We find no miscarriage of justice in our previous disposition of this issue. This claim is denied. *See Clayton v. State,* 1995 OK CR 3, ¶ 3, 892 P.2d 646, 650 (holding that issues that were raised and decided on direct appeal are barred by *res judicata* from further consideration on petition for post-conviction relief).

### 6.

### Cumulative Error

¶ 39 Smith requests that even if we find that none of alleged errors set forth in this application require reversal of his conviction or sentence, we should nevertheless find that the cumulative effect of all the alleged errors and omissions at trial deprived him of his state and federal rights to a fair trial and a reliable sentence. We considered Smith's cumulative error claim on direct appeal and found no merit to the claim because the single error identified was harmless. *Smith,* 2007 OK CR 16, ¶ 81, 157 P.3d at 1179. In this application, we have found no merit to any of Smith's claims and have determined that trial, appellate, and post-conviction counsel were not ineffective. There is, therefore, no cumulative error to consider.

### *CONCLUSION*

¶ 40 After carefully reviewing Smith's subsequent application for post-conviction relief, we conclude that he is not entitled to relief. Accordingly, his application is **DENIED.** Further, Smith's motions for an evidentiary hearing and discovery are **DENIED.** Pursuant to Rule 3.15, *Rules of the Oklahoma*

*Court of Criminal Appeals,* Title 22, Ch.18, App. (2010), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J. and LUMPKIN, LEWIS and SMITH, JJ.: Concur.