[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13928
_____

D.C. Docket No. 3:01-cv-00073-DHB

JOHN WAYNE CONNER,

Petitioner - Appellant,

versus

GDCP WARDEN,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(April 15, 2015)

Before ED CARNES, Chief Judge, MARCUS, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

Petitioner John Wayne Conner, a Georgia prisoner on death row, appeals the

District Court's denial of his petition for a writ of habeas corpus. This is the

second time we review the District Court's denial of Mr. Conner's habeas petition.

See Conner v. Hall, 645 F.3d 1277 (11th Cir. 2011).  In Mr. Conner's first appeal, he was granted a certificate of appealability (COA) on three claims: "(1) whether he procedurally defaulted his [intellectual disability][1] claim; (2) whether he was denied effective assistance of counsel at the sentencing phase of his trial; and (3) whether he was prejudiced by prosecutorial misconduct during closing arguments." Id. at 1280; see also 28 U.S.C. § 2253(c).

Because we held that Mr. Conner did not procedurally default his intellectual-disability claim and that the District Court erred by denying discovery and an evidentiary hearing on his intellectual-disability claim, we remanded the case for the District Court to determine in the first instance whether discovery and an evidentiary hearing were appropriate.  Id. at 1292–94.  It was not necessary for us to decide anything about Mr. Conner's two other claims in light of our remand. Id. at 1293–94.  Instead, we remanded the "entire case." Id. at 1294.

---

[1]  We used the term "mental retardation" in our opinion in Mr. Conner's first appeal, consistent with the Supreme Court's use of that term in Atkins v. Virginia, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002) (holding the Eighth Amendment prohibits the execution of a "mentally retarded offender").  In this opinion, we use the term "intellectual disability," which has the same legal meaning as "mental retardation" did in Atkins.  Hall v. Florida, 572 U.S. ___, ___, 134 S. Ct. 1986, 1990 (2014) ("This opinion uses the term 'intellectual disability' to describe the identical phenomenon."); see also Rosa's Law, Pub. L. No. 111-256, § 4, 125 Stat. 2643, 2645 (2010) (replacing term "mental retardation" with "intellectual disability" in federal law); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013) (DSM-V) (using "intellectual disability"); Am. Ass'n on Intellectual and Developmental Disabilities (AAIDD), Intellectual Disability: Definition, Classification and Systems of Supports 3 (11th ed. 2011) (substituting "intellectual disability" for "mental retardation").

2

On remand, the District Court granted Mr. Conner's request for discovery and an evidentiary hearing on his intellectual-disability claim.  After hearing testimony from seven experts who had evaluated Mr. Conner for intellectual disability, the District Court denied Mr. Conner's intellectual-disability claim on the merits.

Separately, the District Court once again denied Mr. Conner's penalty-phase ineffective-assistance-of-counsel and prosecutorial-misconduct claims, but granted Mr. Conner a COA as to "whether [the District] Court erred in concluding that [Mr. Conner's] trial counsel had not rendered ineffective assistance during the mitigation phase of the trial."  This Court granted Mr. Conner's request to expand the COA to include two more claims: "[w]hether the District Court erred in denying Mr. Conner's claim that he has [intellectual disability] and is not eligible for the death penalty"; and "[w]hether the District Court erred in determining that the state court's decision—that the prosecutor's closing arguments were not so egregious as to require reversal—was not contrary to, or an unreasonable application of, Supreme Court precedent."  After careful review of the record, and with the benefit of briefing and oral argument, we affirm.

## I.  BACKGROUND

Mr. Conner was convicted and sentenced to death for the January 9, 1982, beating death of J.T. White in Telfair County, Georgia.  See Conner v. State, 303

3

S.E.2d 266, 270 (Ga. 1983).  The day after the murder, Mr. White's body was found in a drainage ditch with severe injuries to his head.  Id.  Mr. Conner confessed that he struck Mr. White with a bottle and then beat him with a stick.  Id.  Mr. Conner was indicted for murder, armed robbery, and motor vehicle theft.[2]  Id.

## A. TRIAL PROCEEDINGS

Mr. Conner attempted suicide while awaiting trial in the Telfair County Jail, and was admitted to the Central State Hospital in Milledgeville, Georgia on January 28, 1982, for treatment.  Mr. Conner remained hospitalized until February 19, and the staff evaluated him for competency and insanity pursuant to court order.  During his stay, Mr. Conner was given a full psychological evaluation, which included a social-history review, psychiatric examination, and psychological testing, including the Wechsler Adult Intelligence Scale (WAIS).[3]  Mr. Conner scored a full-scale (FS) IQ of 87 on the WAIS as administered by Central State Hospital staff.  Although his WAIS "test results showed considerable discrepancy between ver[b]al and performance ability . . . the tests results [were] felt to be

---

[2]  The Georgia Supreme Court gave a full discussion of the facts in its opinion written in Mr. Conner's direct appeal.  See Conner, 303 S.E.2d at 270.

[3]  The WAIS is the "standard instrument in the United States for assessing intellectual functioning. . . . The test measures an intelligence range from 45 to 155.  The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning."  Atkins, 536 U.S. at 309 n.5, 122 S. Ct. at 2245 n.5.  "[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition."  Id.

4

accurate and it [was] estimated that he functions within[] the average range of intelligence." On February 19, the hospital issued a letter to the trial judge stating that Mr. Conner was competent to stand trial and could be held criminally responsible for his actions.

Mr. Conner's father originally hired David Morgan to represent Mr. Conner in the underlying criminal case. About the same time, William Dennis Mullis, a public defender, was appointed to represent Mr. Conner in an unrelated case. Mr. Mullis was ultimately appointed to assist Mr. Morgan in this case once Mr. Conner could no longer afford representation through the end of the criminal proceedings.

On June 21, 1982, Mr. Morgan withdrew from the case and Mr. Mullis became Mr. Conner's sole counsel. At a hearing on June 30, Mr. Mullis announced that he would not be seeking to assert the insanity defense based on his review of additional information private counsel had obtained from Central State Hospital. After that, Mr. Mullis filed no other motion pertaining to Mr. Conner's mental health. Neither did he request the appointment of an independent mental health examiner.

At his jury trial on July 12–14, Mr. Conner did not testify or present any evidence on his own behalf. In his guilt-phase closing argument, the prosecutor said the following:

5

> Ladies and gentlemen, as prosecutor, as defense attorney, I have been involved in criminal law for seven years. As District Attorney of this circuit, I have prosecuted nine murder cases. I have never before sought the death penalty. I have seen several killings. I have been responsible for prosecuting several terrible killings. I have never before sought the death penalty.

Mr. Conner's counsel objected. The trial court sustained the objection and gave the jury a curative instruction not to consider the penalty before deciding guilt or innocence.

After the jury returned its verdict of guilt, trial counsel advised the trial court that Mr. Conner had told him not "to enter any evidence in mitigation." The trial court then talked to Mr. Conner, who confirmed that he understood his right to present evidence and that he did "not want to put anything in . . . evidence in mitigation."

The prosecution and the defense then made their closing arguments without presenting more evidence. During his sentencing-phase closing, the prosecutor once again expressed his personal belief, based upon his experience, that the death penalty was appropriate in Mr. Conner's case:

> As I told you, I have never previously sought the death penalty in any murder case, but I tell you, I am seeking it now, and I am asking this jury to go back to that jury room and return a verdict, or a decision to send John Wayne Conner to the electric chair.

Mr. Conner's counsel did not object to the prosecutor's sentencing-phase closing argument, and no curative instruction was given.

6

The jury returned a death sentence upon a finding that the offense was "outrageously and wantonly vile, horrible, and inhuman and that it did involve depravity of mind and aggravated battery to the victim." See O.C.G.A. § 17-10-30(b)(7).

## B.  DIRECT APPEAL

Mr. Conner appealed his conviction and sentence to the Georgia Supreme Court. Conner, 303 S.E.2d 266. The court affirmed Mr. Conner's convictions for motor vehicle theft and murder but vacated his armed-robbery conviction for insufficient evidence. Id. at 270–71. The court sua sponte reviewed the prosecutor's closing argument to ensure that Mr. Conner's death sentence was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." Id. at 272–73 (quoting O.C.G.A. § 17-10-35(c)(1)). The court found the closing argument to be improper because "[t]he portion of the prosecutor's argument referring to his prior criminal experience and the frequency with which he had sought the death penalty was not supported by any evidence and, moreover, was not relevant to any issue in the case." Id. at 276. However, the court held that the remarks were "not so prejudicial or offensive and do not involve such egregious misconduct on the part of the prosecutor as to require reversal of [Mr. Conner's] death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor." Id.

## C.  FIRST STATE HABEAS PROCEEDING

Mr. Conner filed his first writ of habeas corpus in state court on March 23, 1984.  Evidentiary hearings were held on September 24, 1984, and February 11, 1985.

In the September evidentiary hearing, Mr. Mullis testified about his representation of Mr. Conner at trial.  He explained that although raising an insanity defense "crossed [his] mind," he found "[no]thing to substantiate such a claim."  When asked about the Central State Hospital records, Mr. Mullis acknowledged that he knew that Mr. Conner had some psychiatric problems and had a history of drug and alcohol abuse.

Mr. Mullis testified that while he was considering potential mitigation, he spoke with Mr. Conner's parents and brother.  During a visit to Mr. Mullis's office, Mr. Conner's parents discussed his "upbringing" and "socio-economic information."  Mr. Mullis said he learned that Mr. Conner had a "deprived economic background" and "had not been brought up in the best of circumstances."  After Mr. Conner was convicted, Mr. Mullis spoke with Mr. Conner's brother about testifying in mitigation.  Also during this time, Mr. Mullis approached Mr. Conner's girlfriend, Beverly Bates, who had testified against him at trial, and asked if she would testify.  She refused.  Mr. Mullis described Mr. Conner's parents and brother as "waiting in the wings."

8

Mr. Mullis stated that his plan to present the testimony by Mr. Conner's family changed after the guilt-phase verdict, when Mr. Conner said "I don't want to put up any evidence." Mr. Mullis explained that Mr. Conner said "[s]omething to the effect of letting them do what they will." Mr. Mullis testified that he explained the purpose of mitigating evidence to Mr. Conner but that Mr. Conner "didn't seem to care about himself."

At the February hearing, the state habeas court admitted into evidence the affidavits from Mr. Conner's mother and father; his sister, Linda Jones, and her husband, Phillip Jones; and his sister-in-law, Sally Conner. In her affidavit, Mr. Conner's mother testified that Mr. Mullis asked her and her husband if they would be willing to testify on Mr. Conner's behalf. She also said that, had she testified, she would have informed the court that Mr. Conner was a "good and loving" son who worked hard and supported his family. As for Mr. Conner's relationship with his father, she explained that Mr. Conner was "special" to his father but that his father would drink alcohol and beat him as a child and into his teens. Mr. Conner's mother admitted that he had problems, describing him as a "very troubled young man" who drank alcohol and used drugs. She explained that Mr. Conner was always depressed because he felt unloved. She also said that Mr. Conner tried to commit suicide several times, beginning in 1981.

9

In his affidavit, Mr. Conner's father testified that Mr. Mullis never asked if there were other family members and friends who would be willing to testify on Mr. Conner's behalf. He testified that Mr. Mullis never asked about Mr. Conner's school or work background or his relationship with other family members and friends. Mr. Conner's father explained that Mr. Conner "suffer[ed] from constant depression" as a teenager and "started drinking heavily," which only deepened his depression. He also stated that he felt that Mr. Conner needed psychiatric help but the family could not afford it. The father described a suicide attempt, in which Mr. Conner tried to kill himself by cutting ropes suspending him above the ground while working with his father in a tree.

The other affidavits attested to similar facts about Mr. Conner, and no family members said that Mr. Mullis ever asked them to testify on Mr. Conner's behalf in mitigation.

The state habeas court filed a final order denying relief on January 6, 1997. In that order, the court identified and addressed twenty-six specific allegations of ineffective assistance of trial and appellate counsel. Relevant to our inquiry here, the court considered Mr. Conner's claims that his trial counsel, Mr. Mullis, was ineffective for "'intolerably acquiescing' in [Mr. Conner's] decision not to present mitigating evidence" and for "failing to prepare evidence in mitigation." The state habeas court found that Mr. Mullis tried to convince Mr. Conner to present

10

mitigating evidence, and that Mr. Conner knowingly and intelligently waived his right to do so. The court also found that Mr. Mullis prepared to present evidence in mitigation, but that Mr. Conner's "own actions prevented [Mr. Mullis] from presenting evidence." As for the affidavits of Mr. Conner's family members, the court concluded that they "d[id] not overcome" Mr. Conner's waiver of his right to present mitigation evidence or otherwise establish ineffectiveness of counsel. Finding Mr. Mullis's performance to be objectively reasonable, the court concluded that Mr. Conner could not prevail on his ineffective assistance of counsel claim. See Strickland v. Washington, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 2064 (1984). The Georgia Supreme Court denied Mr. Conner's application for certificate of probable cause on September 11, 2000.

## D. SECOND STATE HABEAS PROCEEDING

On October 3, 2001, Mr. Conner filed his second state habeas petition, asserting one claim: that he is intellectually disabled and ineligible for the death penalty. Without an evidentiary hearing, the court dismissed the second petition as successive under O.C.G.A. § 9-14-51. The court held that the claim could have been raised in an amendment to his original habeas petition because Fleming v. Zant[4] was decided while Mr. Conner's first state habeas petition was pending in

---

[4] In Fleming v. Zant, 386 S.E.2d 339 (Ga. 1989), the Georgia Supreme Court held that execution of the intellectually disabled constitutes "cruel and unusual punishment" under the Georgia

11

state court.  Mr. Conner's application for a certificate of probable cause to the Georgia Supreme Court to appeal the dismissal of his second state habeas corpus petition was denied on March 25, 2002.

On June 20, 2002, the United States Supreme Court decided Atkins, holding that the Eighth Amendment categorically prohibits the execution of an intellectually disabled defendant.  On July 11, Mr. Conner timely filed a petition for certiorari in the United States Supreme Court relying on Atkins.  The Supreme Court denied certiorari. Conner v. Head, 537 U.S. 908, 123 S. Ct. 249 (mem.), reh'g denied, 537 U.S. 1069, 123 S. Ct. 657 (2002) (mem.).

## E.  FEDERAL HABEAS PROCEEDINGS

Mr. Conner filed his § 2254 petition in the District Court on November 13, 2001.  The federal petition contained thirty-three separate claims for relief, including an Eighth Amendment challenge to the death penalty based on intellectual disability under Atkins.

On March 31, 2004, Mr. Conner filed a motion for leave to conduct limited discovery on his Atkins claim.  In his memorandum in support of that motion, Mr.

---

Constitution.  Id. at 342.  Further, Fleming established a procedure for habeas courts to follow in evaluating intellectual-disability claims for defendants, like Mr. Conner, who were tried and sentenced before the effective date of Georgia's 1988 statutory prohibition against executing intellectually disabled offenders.  Id. at 342–43.

12

Conner alleged that he was intellectually disabled; that his elementary school records attested to his disability; that his elementary school teachers who were still living were willing to attest to his disability; and that he had never been granted access to an independent defense evaluation of his intellectual-disability claim.

Despite the state court's ruling that he procedurally defaulted his intellectual-disability claim, Mr. Conner argued that he followed Georgia's procedures as provided in Fleming and Turpin v. Hill, 498 S.E.2d 52, 53–54 (Ga. 1998).[5] Alternatively, Mr. Conner argued that the state's procedural bar was not adequate to bar federal review because it was not consistently applied.

On September 8, 2004, the District Court denied Mr. Conner's discovery request, determining that he had defaulted his intellectual-disability claim in state court. The District Court denied Mr. Conner's habeas petition in its entirety on November 6, 2009.

In Mr. Conner's first appeal to this Court, we vacated the District Court's judgment denying his habeas petition and remanded the entire case to the District Court for further proceedings consistent with our opinion. Conner, 645 F.3d at 1293–94. The District Court then granted Mr. Conner's request for discovery and an evidentiary hearing on his intellectual-disability claim but ultimately denied the

---

[5] In Turpin, the Georgia Supreme Court held that state habeas relief was available to capital petitioners asserting intellectual-disability claims in state habeas petitions, regardless of whether the claim had been procedurally defaulted. 498 S.E.2d at 53.

13

claim on the merits.  The District Court also denied Mr. Conner's penalty-phase ineffective-assistance-of-counsel and prosecutorial-misconduct claims.  We review each claim in turn.

## II.  STANDARDS OF REVIEW

We review de novo the District Court's denial of a 28 U.S.C. § 2254 petition.  Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010).  "Although we review de novo the District Court's conclusions on legal questions and mixed questions of law and fact, we generally review the District Court's findings of fact for clear error."  Madison v. Comm'r, Ala. Dep't of Corr., 761 F.3d 1240, 1245 (11th Cir. 2014).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  Cullen v. Pinholster, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011).  Under AEDPA, if a state court has adjudicated the merits of a claim—as the state court did here for Mr. Conner's ineffective-assistance-of-counsel and prosecutorial-misconduct claims—we cannot grant habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

14

proceeding."  28 U.S.C. § 2254(d).  Section 2254(d) "is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  Pinholster, 131 S. Ct. at 1398 (internal citations and quotation marks omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, ___, 131 S. Ct. 770, 786 (2011) (quotation marks omitted).

State court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  "AEDPA's statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact."  Tanzi v. Sec'y, Fla. Dep't of Corr., 772 F.3d 644, 651 (11th Cir. 2014) (quotation marks omitted).  "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact."  Strickland, 466 U.S. at 698, 104 S. Ct. at 2070.

## III.  DISCUSSION

### A.  INTELLECTUAL-DISABILITY CLAIM

The Eighth Amendment to the United States Constitution prohibits the execution of the intellectually disabled.  Atkins, 536 U.S. at 321, 122 S. Ct. at

15

2252.  In Mr. Conner's first appeal, we held that his intellectual-disability claim had never been adjudicated on the merits in state court and "no adequate [state] procedural bar preclude[ed] federal review."  Conner, 645 F.3d at 1292.  As a result, "the District Court [was] not bound by AEDPA's deferential standards in 28 U.S.C. § 22554(d) and federal court review [was] de novo."  Id.; see also Porter v. McCollum, 558 U.S. 30, 39, 130 S. Ct. 447, 452 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's Strickland claim de novo.").  But the District Court has now held that Mr. Conner is not intellectually disabled, and we review that finding for clear error.  See Holladay v. Allen, 555 F.3d 1346, 1353–54 (11th Cir. 2009).

When we remanded this case, we guided the District Court in the exercise of its discretion to grant discovery or an evidentiary hearing, including instructions that it "must apply Georgia's substantive [intellectual disability] criteria" and require Mr. Conner to prove his claim only "by a preponderance of the evidence."  Conner, 645 F.3d at 1293 & n.17.  On remand, the District Court expressly acknowledged that "Georgia state law . . . govern[s] the procedure for determining whether [Mr. Conner] is [intellectually disabled] and thus ineligible for the death penalty."  The District Court specifically cited Georgia's statutory definition of intellectual disability, O.C.G.A. § 17-7-131(a)(3).

16

Under Georgia law, intellectual disability "means having [1] significantly subaverage general intellectual functioning [2] resulting in or associated with impairments in adaptive behavior which [3] manifested during the developmental period." Id. We have recognized that Georgia's definition of intellectual disability "essentially tracks the AAMR and APA definitions mentioned in Atkins."[6] Hill v. Humphrey, 662 F.3d 1335, 1341 (11th Cir. 2011) (en banc).

The District Court initially found the "evidence sufficient to warrant further inquiry" and appointed its own "independent" expert, Dr. Thomas R. Swift, M.D.,[7] to determine if Mr. Conner is intellectually disabled under Georgia law. The District Court then found that Mr. Conner showed good cause for discovery and allowed the parties to do discovery on his intellectual-disability claim, including expert examination of Mr. Conner "in accordance with the standards elucidated in [Atkins] . . . and O.C.G.A. § 17-7-131(a)(3)." In the end, seven experts evaluated Mr. Conner for intellectual disability: (1) Dr. Swift (the District Court's appointed

---

[6] In Atkins, the Supreme Court referenced the clinical definitions for intellectual disability used by the American Association of Mental Retardation (AAMR) (which has since changed its name to the American Association on Intellectual and Developmental Disability (AAIDD)), and the American Psychiatric Association (APA). Atkins, 536 U.S.at 308 n.3, 122 S. Ct. at 2245 n.3. The Court also noted states' "statutory definitions of [intellectual disability] are not identical, but generally conform to the clinical definitions" of the AAIDD and APA. Id. at 317 n.22, 122 S. Ct. at 2250 n.22.

[7] The District Court described Dr. Swift as a "physician of broad experience," "a Diplomat of the American Board of Psychiatry and Neurology, Past President of the American Academy of Neurology, former Chairman of the Department of Neurology at the Medical College of Georgia (now Georgia Health Sciences University) and . . . active in many other professional organizations."

17

neurologist); (2) Dr. Bhushan Agharkar, M.D. (Mr. Conner's psychiatrist); (3) Dr.

Stephen Greenspan, Ph.D. (Mr. Conner's psychologist); (4) Dr. Barry Crown (Mr.

Conner's neuropsychologist); (5) Dr. Elizabeth Beck, Ph.D. (Mr. Conner's social

worker); (6) Dr. Glen King, Ph.D. (state's psychologist); and (7) Dr. Matthew

Norman, M.D. (state's psychiatrist).  All of these experts testified at the

evidentiary hearing held before the District Court on May 7 and 8, 2013.  Each

expert's written evaluation was admitted into evidence.

Three defense experts—Drs. Agharkar, Crown, and Greenspan—all

concluded that Mr. Conner has significantly sub-average intellectual functioning

based on academic achievement, intelligence testing, and neuropsychological

testing.[8]  These defense experts relied on two IQ scores: (1) Mr. Conner's FS IQ

score of 87 on the WAIS administered by Central State Hospital in 1982;[9] and (2)

his FS IQ score of 80 on the WAIS-IV administered by Dr. King in 2013.[10]

---

[8]  A fourth defense expert, Dr. Beck, prepared a psychosocial history assessment of Mr. Conner, focusing "primarily on the conditions of [his] childhood and development through young adulthood."  Based on her review of background materials and collateral witness interviews, Dr. Beck opined that Mr. Conner's life history indicated "he is an individual with significant intellectual impairments."

[9]  On his 1982 WAIS test, Mr. Conner obtained a performance IQ score of 97, a verbal IQ score of 80, and a FS IQ score of 87, unadjusted for the Flynn effect or scoring error.

[10]  When Dr. King administered the WAIS-IV in 2013, Mr. Conner obtained a FS IQ of 80, a verbal comprehension index of 81, and a perceptual reasoning index of 88, unadjusted for the Flynn Effect or scoring error.

18

Applying the Flynn effect[11] to these test scores caused the IQ score on the 1982

WAIS to be reduced by nine points to 78, according to Mr. Conner's experts.

Similarly, the Flynn effect reduced Mr. Conner's IQ score on the 2013 WAIS-VI

by two points to 78.  Finally, scoring errors on both the WAIS and WAIS-IV

lowered the full scale IQ scores on both tests by one point to 77, after correcting

for the Flynn Effect, according to Dr. Crown.[12]

Mr. Conner's neuropsychologist, Dr. Crown, opined, "[b]ecause Mr.

Conner's verbal skills are much weaker than his performance skills, his Full Scale

IQ score on a standardized test for intellectual functioning such as the WAIS tests

---

[11] When considering an individual's intellectual functioning, this Court has recognized that the statistical phenomena known as the Standard Error of Measure (SEM) and the Flynn effect can be applied by a test evaluator in arriving at an individual's final test score.  Thomas v. Allen, 607 F.3d 749, 753 (11th Cir. 2010) (citations omitted); see also Burgess v. Comm'r, Ala. Dep't of Corr., 723 F.3d 1308, 1321 nn.15 & 16 (11th Cir. 2013).  With respect to the Flynn effect in particular:

> An evaluator may also consider the "Flynn effect," a method that recognizes the fact that IQ test scores have been increasing over time.  The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects.  Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field.

Thomas, 607 F.3d at 753 (citations omitted).  The District Court was, in its words, "extremely doubtful of the Flynn Effect."  While the experts for the defense agreed that the Flynn effect should be taken into consideration to reduce Mr. Conner's IQ scores, the state's expert, Dr. King, did not.  Dr. King's opinion was that there is no sound basis for the Flynn effect.  However, the District Court found it unnecessary to resolve the experts' conflicting testimony about whether the Flynn Effect exists because, even if it does and was applied, Conner's IQ score would be 77.

[12] While he rejected application of the Flynn effect, Dr. King did recognize that there was a one point scoring error in the WAIS-IV, which changed the perceptual reasoning index from 88 to 87 and the FS IQ from 80 to 79.  Dr. King testified the scoring error did not change his assessment of Mr. Conner's performance on the test.

19

will tend to be inaccurate and an overestimate of his true level of functioning." Instead, Dr. Crown indicated that Mr. Conner's "[v]erbal IQ score on the 1982 WAIS, corrected for the Flynn effect, is a more accurate representation of [Mr. Conner's] overall cognitive functioning and is significantly subaverage." Mr. Conner's verbal IQ score on the 1982 WAIS was 70, corrected for the Flynn effect and a one point scoring error.

Drs. Agharkar, Beck, Crown, and Greenspan also each testified that Mr. Conner had adaptive skill deficits consistent with intellectual disability, with onset prior to age eighteen. According to Dr. Greenspan, Mr. Conner's history demonstrates adaptive deficits in five areas: work, home living, functional academics, social judgment, and communication. Dr. Agharkar found Mr. Conner had deficits in four areas: work, functional academics, home living, and communication. Dr. Beck testified that Mr. Conner had adaptive deficits in three areas: home living, work, and functional academics. While Dr. Crown's evidentiary hearing testimony addressed only Mr. Conner's impairment in social adjustment, Dr. Crown's written report indicated he "would expect to see the kind of adaptive deficits identified by Dr. Beck and Dr. Agarkar in someone with the deficits [he] saw in [his] testing of Mr. Conner."

20

Finally, Drs. Agharkar, Crown, and Greenspan concluded that Mr. Conner met the criteria for mild intellectual disability.

Drs. King, Norman, and Swift all agreed that Mr. Conner is not intellectually disabled.  Dr. King testified that he did "not find any evidence for [intellectual disability]."  Rather, Dr. King explained that the pattern of test scores from the 2013 WASI-IV he administered to Mr. Conner, as well as the 1982 WAIS, is indicative "of the pattern that we get in individuals who have learning disabilities." Dr. King emphasized that all of Mr. Conner's index scores on the WAIS-IV were "in the 80s," including a performance IQ score of 87.  With regard to the results of the Wide Range Achievement Test (WRAT) Dr. King administered to Mr. Conner in 2013,[13] Dr. King agreed that Mr. Conner's "significantly reduced reading score and writing score . . . indicate the presence [of] both dyslexia, that is a reasoning disorder, and dysgraphia, which is a writing disorder."  Dr. King did not evaluate Mr. Conner for adaptive behavioral deficits because he understood the Georgia statute and DSM-IV to require an IQ score of 70 or below for a diagnosis of intellectual disability and "Mr. Conner didn't reach or even get close to that," in Dr. King's view.

---

[13]  Mr. Conner's standard scores on the WRAT-4 were: word reading 73; spelling 73; and math computation 84.  Dr. King explained Mr. Conner's scores in reading and spelling were two standard deviations below the mean, but he "wouldn't have a learning disability in math."

21

Dr. Norman concluded "with a reasonable degree of medical certainty, [that] Mr. John Wayne Conner does not meet criteria for [intellectual disability] either currently or in the past." More specifically, Dr. Norman noted that Mr. Conner did not have an IQ score from an individually administered IQ test "approximately 70 or below." He also found "insufficient evidence of concurrent deficits or impairment in present adaptive functioning in at least two areas." Rather, Dr. Norman indicated Mr. Conner "currently demonstrated a history of a lack of impairments or deficits in communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Dr. Norman found no evidence of onset of intellectual disability before age 18.

Finally, Dr. Swift concluded that Mr. Conner is not intellectually disabled. Dr. Swift noted the absence of any IQ scores less than 70. In Dr. Swift's opinion, Mr. Conner "seemed to have normal mental and adaptive function and normal emotional and language expression."

After hearing two days of evidence, the District Court took a one-day break and then heard closing arguments from the parties. The District Court then

22

announced its findings of fact and conclusions of law from the bench.[14]  The

District Court began by clearly identifying the three elements from Georgia's

intellectual disability standard, citing and discussing O.C.G.A. § 17-7-131(a)(3).

The court correctly treated Georgia's definition of intellectual disability and the

definition from the DSM-IV "as each being the functional equivalent of the other."

The District Court properly based its rulings on the preponderance-of-evidence

standard, per our instructions, see Conner, 645 F.3d at 1293 n.17.  The District

Court concluded Mr. Conner had not shown any of the three elements required

under the Georgia statute to establish intellectual disability.

Specifically, the District Court found Mr. Conner had not shown he "suffers

from a significantly subaverage general intellectual functioning."  "On the

contrary," the District Court found by clear and convincing evidence that Mr.

Conner's "general intellectual functioning is not significantly subaverage."

(emphasis added).  Although the District Court determined that Mr. Conner's IQ is

"the level of a WAIS-IV intelligence score of 79 and has been throughout his

maturity," the District Court "agree[d] with [Mr. Conner's counsel] that a bright

line methodology cannot be employed here."  The District Court explained that

determining the existence of intellectual disability "is not simply a function of

---

[14] "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of evidence . . . ."  Fed. R. Civ. P. 52(a)(1).

intelligence or an intelligence quotient or a score on a WAIS-IV type of test. . . . It is not that simple. . . . Now while I think that the test is very important and the scoring of it is critical here, it is not the final answer." Still, the District Court considered the IQ score "to be a very important factor," taking into consideration that "the law of Georgia would allow some slippage . . . around the area of 70 but this WAIS score does not hover around 70. It hovers around 80." It turns out the District Judge was prescient in his view that intellectual disability is not just a number. See Hall, 134 S. Ct. at 2001 ("Intellectual disability is a condition, not a number.").[15]

> The District Court went on to find:

> [T]he Petitioner ha[d] not shown that the evidence supports a finding by a preponderance of the evidence or otherwise that John Wayne Conner has significant limitations or deficits in adaptive functioning in at least two of these areas. One, communication; two, self-care; three, home living; four, social interpersonal skills; five, use of community resources; six, self-direction; seven, functional academic skills; eight, work; nine, leisure; ten, health; and eleven, safety.

Finally, the District Court made a finding that Mr. Conner had not shown by a preponderance of the evidence "that the conditions that he is obligated to show were manifest during the developmental period." Although the District Court

---

[15] This Court has ruled that the Supreme Court has not made the new rule announced in Hall retroactive to cases on collateral review for the purposes of authorizing petitioners to file second or successive habeas corpus applications under 28 U.S.C. § 2244(b)(2)(A). See In re Henry, 757 F.3d 1151, 1159 (11th Cir. 2014).

agreed that Mr. Conner "was a troubled youth," the judge explained "this did not equate to impairments in adaptive behavior associated with subaverage, general intellectual functioning."

On this record, we cannot say that the District Court clearly erred in any of its findings related to the three elements Mr. Conner was charged with proving in order to prevail on his intellectual-disability claim under Georgia law.  "Findings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6); see also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573–74, 105 S. Ct. 1504, 1511–12 (1985); United States v. Lebowitz, 676 F.3d 1000, 1009 (11th Cir. 2012) (per curiam) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony." (quotation marks and alterations omitted)).  "The clearly erroneous standard is very deferential." Madison, 761 F.3d at 1255.  "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 105 S. Ct. at 1511 (quotation marks and alterations omitted).

25

We remanded this case to the District Court to give Mr. Conner a fair opportunity to litigate his intellectual-disability claim after we concluded the claim was not procedurally barred.  Mr. Conner took full advantage of that opportunity by having three different defense experts evaluate him and a fourth expert develop a comprehensive psychosocial history assessment.  The District Court also granted Mr. Conner an evidentiary hearing in which he was able to present his experts and subject the state's and the court's experts to meaningful cross examination.  In short, Mr. Conner had a fair opportunity to investigate, develop, and present evidence in support of his intellectual-disability claim.  As it turned out, he was not able to convince the fact-finder by a preponderance of the evidence that he is intellectually disabled.

While Mr. Conner faults the District Court for relying too much on Dr. Swift, the fact remains that the assessments done by Dr. King and Dr. Norman also support the District Court's finding that Mr. Conner is not intellectually disabled. The record demonstrates that the District Court applied the correct legal standards in making its findings of fact and conclusions of law regarding Mr. Conner's intellectual-disability claim.  The intellectual-disability determination is fact-intensive, requiring careful consideration of the petitioner's intellectual functioning, adaptive skills, and age of onset, with the assistance of qualified

26

experts.  Cf. Hall v. Quarterman, 534 F.3d 365, 371 (5th Cir. 2008) ("The issue of [intellectual disability], defined by Atkins[,] . . . is fact-intensive and rests on nuanced determinations under broadly stated concepts such as limitations in adaptive functioning." (quotation marks omitted)).  Mr. Conner got that careful consideration here.

Because the District Court's finding that Mr. Conner is not intellectually disabled is plausible in light of the entire record, it is not clearly erroneous.  See Anderson, 470 U.S. at 573–74, 105 S. Ct. at 1511 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").  Finally, where, as here, "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574, 105 S. Ct. at 1511.

B.  PENALTY PHASE INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance, a petitioner must show both deficient performance and prejudice.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  To prove deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064.  To establish prejudice, a petitioner must demonstrate a "reasonable probability

27

that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694, 104 S. Ct. at 2068.  In challenging a death sentence, a petitioner establishes prejudice by showing that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695, 104 S. Ct. at 2069.  Failure to make the showing either as to performance or prejudice is fatal to a defendant's claim.  Kokal v. Sec'y, Dep't of Corr., 623 F.3d 1331, 1344 (11th Cir. 2010).  A court deciding an ineffectiveness claim need not "address both components of the inquiry if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.  In this case, we decide only the prejudice prong because we find it dispositive in light of Mr. Conner's instructions to counsel not to present mitigating evidence.  See Schriro v. Landrigan, 550 U.S. 465, 478, 127 S. Ct. 1933, 1942 (2007).  Further, because we conclude that Mr. Conner would not be entitled to habeas relief even under de novo review, we affirm the District Court's denial of relief under that standard without resolving whether AEDPA deference applies.[16]

---

[16]  "Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review . . . because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is

28

For the <u>Strickland</u> prejudice analysis here, "[t]he United States Supreme Court has told us in no uncertain terms that if a competent defendant did instruct his counsel not to offer any mitigating evidence, 'counsel's failure to investigate further <u>could not have been prejudicial under Strickland</u>.'" <u>Allen v. Sec'y, Fla. Dep't of Corr.</u>, 611 F.3d 740, 762 (11th Cir. 2010) (quoting <u>Landrigan</u>, 550 U.S. at 475, 127 S. Ct. at 1941). "[T]he [<u>Landrigan</u>] rule follows naturally from <u>Strickland</u>'s formulation of the prejudice prong, for there cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event." <u>Id.</u> (quotation marks omitted).

The record reflects that Mr. Conner affirmatively instructed trial counsel not to present any mitigating evidence. After it had deliberated for fifty minutes, the jury found Mr. Conner guilty on all counts. Before beginning the sentencing phase of the trial, the trial court granted a brief recess for Mr. Mullis to confer with Mr.

---

rejected on <u>de novo</u> review, see § 2254(a)." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390, 130 S. Ct. 2250, 2265 (2010); see also <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1291 (11th Cir. 2012) ("The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on <u>de novo</u> review. . . . [W]e have employed this approach even when it was clear that the deference afforded by section 2254(d) applied." (quotation marks omitted)). This Court has previously affirmed the denial of § 2254 relief after conducting <u>de novo</u> review without resolving whether AEDPA deference applies. <u>See, e.g.</u>, <u>Wellons v. Warden</u>, 695 F.3d 1202, 1213 (11th Cir. 2012); <u>Owen v. Fla. Dep't of Corr.</u>, 686 F.3d 1181, 1201 (11th Cir. 2012); <u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1109–10 (11th Cir. 2012); <u>Payne v. Allen</u>, 539 F.3d 1297, 1317 n.18 (11th Cir. 2008).

29

Conner.  When the proceedings reconvened, the court asked Mr. Mullis if he

planned to present any evidence in mitigation.  Mr. Mullis responded:

> Your Honor, I had planned on calling four witnesses—of course, the defendant, and his brother, and father, and his mother.  After the verdict came in I talked to Mr. Conner in a room adjacent to the courtroom and he has informed me that he does not desire me to enter any evidence in mitigation.  He does not desire to do that himself, he has told me.  I have counselled him that my advice would be to do otherwise.  My advice would be to put in some evidence to mitigate this.  He has told me he does not desire to do that.

The following colloquy then took place between the court and Mr. Conner:

> THE COURT:      Mr. Conner, do you understand your rights to present evidence?
>
> MR. CONNER:    Yeah.
>
> THE COURT:      And you have instructed your counsel and you are telling the Court now that you do not want to put anything in in [sic] evidence in mitigation?
>
> MR. CONNER:    That's right.
>
> THE COURT:      All right, sir.  That's your privilege.

This record demonstrates that Mr. Conner prevented trial counsel from presenting

mitigating evidence, and distinguishes Mr. Conner's case from other cases where

counsel was found ineffective for failing to investigate and present mitigation, such

as Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005), and Wiggins v. Smith,

539 U.S. 510, 123 S. Ct. 2527 (2003).  See Landrigan, 550 U.S. at 478, 127 S. Ct.

30

at 1942; see also Newland v. Hall, 527 F.3d 1162, 1205 (11th Cir. 2008)

(following the lead of Landrigan in "drawing a distinction between a defendant's

passive non-cooperation and his active instruction to counsel not to engage in

certain conduct").

Our earlier decision in Gilreath v. Head, 234 F.3d 547 (11th Cir. 2000), is

instructive here.  See Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1360

(11th Cir. 2009) ("Our earlier decision in Gilreath . . . is consistent with

Landrigan.").  In Gilreath, a habeas petitioner instructed his trial counsel not to

present mitigating evidence during the penalty phase of his capital trial.  234 F.3d

at 549–50.  This Court denied Mr. Gilreath's penalty-phase ineffective-assistance-

of-counsel claim, explaining that to show prejudice a petitioner "actually must

make two showings":

> First, Petitioner must show a reasonable probability that—if Petitioner
> had been advised more fully about character evidence or if trial
> counsel had requested a continuance—Petitioner would have
> authorized trial counsel to permit such evidence at sentencing.
> Second, Petitioner must establish that, if such evidence had been
> presented at sentencing, a reasonable probability exists that the jury
> would have concluded that the balance of aggravating and mitigating
> circumstances did not warrant death.

Id. at 551–52 (quotation and footnote omitted).  Like the petitioner in Gilreath, and

because Mr. Conner instructed his attorney not to present mitigation, he must make

both of these showings to prove prejudice.

31

On the record before us, we cannot say that Mr. Conner has shown "a reasonable probability that—if [he] had been advised more fully about character evidence or if trial counsel had requested a continuance—[Mr. Conner] would have authorized trial counsel to permit such evidence at sentencing." Id. at 551. Mr. Conner does not argue that trial counsel should have requested a continuance. Rather, Mr. Conner contends "there is a reasonable probability that prepared and informed defense counsel would have been able to persuade Mr. Conner to change his mind after 'full and careful' consultation, as Mr. Conner did after habeas counsel investigated and consulted with Mr. Conner as to the significance of the available mitigating evidence." But Mr. Conner has not shown a reasonable probability that he would have authorized trial counsel to present the mitigating evidence he now offers. Apart from the fact that he allowed postconviction counsel to investigate and present mitigation evidence, Mr. Conner has pointed to no direct or circumstantial evidence (such as postconviction testimony or an affidavit from Mr. Conner himself) that he would have allowed trial counsel to present mitigating evidence.

Mr. Conner's willingness to allow the presentation of mitigating evidence in postconviction proceedings, without more, does not show a reasonable probability that he would have allowed trial counsel to present mitigation at the time of his

32

capital sentencing.  See Allen, 611 F.3d at 763 ("Allen's willingness to present mitigation evidence today, however, does nothing to alter his steadfast desire at the time of his trial to seek the death penalty instead of life in prison.").  Because Mr. Conner has not shown prejudice under Gilreath's first prejudice prong, we need not consider Gilreath's second prejudice prong.[17]  Mr. Conner is not entitled to habeas relief on his penalty-phase ineffective-assistance-of-counsel claim.

## C.  PROSECUTORIAL MISCONDUCT

The final issue we must consider is "[w]hether the District Court erred in determining that the state court's decision—that the prosecutor's closing arguments were not so egregious as to require reversal—was not contrary to, or an unreasonable application of, Supreme Court precedent."

"To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant."  United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991).  To satisfy the second prong, the prosecutor's improper remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct.

---

[17]  See Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the [first] prong if the defendant cannot meet the [second] prong, or vice versa." (internal citation omitted)).

2464, 2471 (1986) (quotation marks omitted); see also Romine v. Head, 253 F.3d

1349, 1366 (11th Cir. 2001) (explaining that "habeas relief is due to be granted for

improper prosecutorial argument at sentencing only where there has been a

violation of due process, and that occurs if, but only if, the improper argument

rendered the sentencing stage trial fundamentally unfair").

> In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors.

Land v. Allen, 573 F.3d 1211, 1219–20 (11th Cir. 2009) (per curiam) (citing

Romine, 253 F.3d at 1369–70).

Mr. Conner argues that the prosecutor improperly injected evidence of his

personal experience in seeking the death penalty and relied on materially

inaccurate and prejudicial evidence in closing argument.  During the guilt phase of

Mr. Conner's trial, the prosecutor told the jury that he had practiced criminal law

for seven years; that as district attorney he had prosecuted nine murder cases; but

that he had never sought the death penalty until Mr. Conner's case.  Mr. Conner's

counsel objected.  The trial court sustained the objection and gave the jury a

curative instruction not to consider the penalty before deciding guilt or innocence.

34

During the penalty-phase closing argument, the prosecutor once again expressed

his personal belief, that Mr. Conner deserved to be sentenced to death:

> As I told you, I have never previously sought the death penalty in any murder case, but I tell you, I am seeking it now, and I am asking this jury to go back to that jury room and return a verdict, or a decision to send John Wayne Conner to the electric chair.

Mr. Conner did not object to the prosecutor's penalty-phase closing and no

curative instruction was given.

Although Mr. Conner did not present his prosecutorial-misconduct claim on

direct appeal, the Georgia Supreme Court sua sponte reviewed the arguments of

counsel to ensure that the sentence of death was not imposed "'under the influence

of passion, prejudice, or any other arbitrary factor.'"  Conner, 303 S.E.2d at

272 (quoting O.C.G.A. § 17-10-35(c)(1)).  In its review, the Georgia high court

noted that counsel should not "go outside the facts appearing in the case and lug in

extraneous matters as if they were a part of the case," and that "[w]hat the law

condemns is the injection into the argument of extrinsic and prejudicial matters

which have no basis in the evidence."  Id. at 276 (quotation marks omitted).

The George Supreme Court found the prosecutor's closing argument to be

improper because "[t]he portion of the prosecutor's argument referring to his prior

criminal experience and the frequency with which he had sought the death penalty

was not supported by any evidence and, moreover, was not relevant to any issue in

35

the case." Id.  The court held, however, that the remarks were "not so prejudicial or offensive and do not involve such egregious misconduct on the part of the prosecutor as to require reversal of appellant's death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor." Id.

We agree with the Georgia Supreme Court that the prosecutor's closing arguments were improper.  But we must defer to its determination that the arguments were not constitutionally infirm unless Mr. Conner can show that the state court's decision was contrary to or involved an unreasonable application of Supreme Court precedent.  See 28 U.S. C. § 2254(d)(1).  Our precedent requires us to conclude that Mr. Conner cannot make this showing.  In Gates v. Zant, 863 F.2d 1492 (11th Cir. 1989) (per curiam), we found that "the prosecutor's assertion that he sought the death penalty rarely and that he had made the careful judgment that this case warranted it" was improper, but we concluded that "[c]onsidering the totality of the circumstances . . . th[is] argument[] did not render the sentencing proceeding fundamentally unfair." Id. at 1503.  We observed that a "'prosecutorial expertise' argument" is "troubling . . . because of [its] tendency to mislead the jury as to its role." Id.  But we explained that our decision in Gates was controlled by our previous analysis of "prosecutorial expertise" arguments in Brooks v. Kemp,

762 F.2d 1383 (11th Cir. 1985) (en banc), vacated and remanded, 478 U.S. 1016, 106 S. Ct. 3325 (1986), aff'd on remand, 809 F.2d 700 (11th Cir. 1987) (en banc). See Gates, 863 F.2d at 1503.

In Brooks we recognized that "[t]he discussion of the prosecutor's practice of seeking death only in a few cases during the past years was improper" because it "was unsupported in the evidence and, at best, irrelevant." Brooks, 762 F.2d at 1410. In fact, we cited directly to the Georgia Supreme Court's analysis of the prosecutor's arguments in Mr. Conner's case in support of this conclusion. See id. (citing Conner, 303 S.E.2d at 276). Nevertheless, we held that the "prosecutorial expertise" argument, while troubling, did not render the sentencing fundamentally unfair. Id. at 1413–14. In reaching this conclusion, we explained that "[t]he prosecutor did not simply state that he had selected this case from among the mass of cases; rather, he expressly laid out before the jury his reasons for selecting this case." Id. at 1414. As such, "the jury could . . . determine for itself the validity of each underlying factor and the degree to which each factor indicated that death was appropriate." Id. We also explained that the arguments of the prosecutor and defense counsel and "[m]ost importantly," "the judge's instructions . . . unambiguously placed the sole responsibility [for deciding whether to impose the death penalty] on the jury." Id.

In Mr. Conner's case, as in <u>Brooks</u>, the arguments of counsel and instructions of the judge "unambiguously placed the sole responsibility on the jury." <u>See</u> <u>id.</u>  For example, in concluding his charge to the jury, the trial judge stated: "Whatever the penalty to be imposed, within the limits of the law as I have instructed you is a matter solely for you members of the jury to determine." While we recognize that here, unlike in <u>Brooks</u>, the prosecutor did not set out his reasons for selecting this case to pursue the death penalty, we nevertheless conclude that, like in <u>Gates</u>, "the court's instructions to the jury, and the totality of the sentencing proceedings, made absolutely clear to the jury the proper role of the jury in the sentencing proceedings." <u>Gates</u>, 863 F.2d at 1503 n.11.

Finally, with respect to the prosecutor's closing argument at the guilt phase of the trial, we observe that the trial judge sustained defense counsel's contemporaneous objection and gave the jury a curative instruction. <u>See</u> <u>Land</u>, 573 F.3d at 1219–20 (explaining that contemporaneous objection by defense counsel and the trial court's instructions are among the factors to be considered in determining whether prosecutorial "arguments are sufficiently egregious to result in the denial of due process"). We conclude that the Georgia Supreme Court's decision on this issue neither was contrary to nor involved an unreasonable application of Supreme Court precedent.

## IV.  CONCLUSION

For all the reasons above, we affirm the District Court's denial of habeas relief.

**AFFIRMED.**